**SARASOTA, FLORIDA, a city and a political subdivision of the State of Florida, Plaintiff-Appellant,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, as Executive Branch of the United States, of the United States Environmental Protection Agency and not personally, Defendants-Appellees.**

No. 85–3637.

United States Court of Appeals, Eleventh Circuit.

Sept. 15, 1986.

Christopher L. Rissetto, Michael K. Love, Joseph M. Zorc, John S. Pachter, Daniel E. Toomey, Vienna, Va., Edward de la Parte, Jr., Tampa, Fla., Richard J. Taylor, Sarasota, Fla., for plaintiff-appellant.

John T. Stahr, Dirk D. Snel, Washington, D.C., for defendants-appellees.

Before HILL, Circuit Judge, HENDER-SON [*] and BROWN [**], Senior Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In this case, we are called upon to decide whether an unsuccessful Clean Water Act grant applicant can pursue a remedy against the Environmental Protection Agency (EPA) in the District Court or must resort to the Claims Court for relief. Presented to us is the converse of the more typical situation in which EPA hales the procrastinating polluter into court for failing to meet federal discharge permit requirements. Instead, the City of Sarasota, Florida (Sarasota) seeks to force EPA to fund its plan to eliminate completely the discharge of the city's wastewater effluent into Sarasota Bay. EPA does not object to Sarasota's plan as such; it only objects to spending federal grant money for the project because it believes that the plan's costs do not justify the allegedly marginal water quality benefits that the plan will produce. The District Court held that Sar-

---

[*] See Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

asota's suit belonged in the Claims Court because it ultimately sought the payment of money, i.e., grant funds. We find that jurisdiction properly belongs in the District Court and we reverse.

## Cleaning Up the Bay

This case arises out of Sarasota's 1979 application for a Clean Water Act[1] grant amendment to upgrade its wastewater treatment plant. For years, Sarasota has discharged its treated wastewater into Whitaker Bayou, a tributary of Sarasota Bay, an important local resource. Concerned that the continuing discharge into Whitaker Bayou was degrading the water quality of Sarasota Bay, and under pressure from state and local laws to improve its effluent quality, the city proposed a two-part wastewater treatment improvement program in its grant application. First, Sarasota proposed to expand the plant capacity from 9 to 13 million gallons per day. Second, Sarasota proposed to route the effluent from the expanded plant into a "spray irrigation system" that would spread the wastewater over agricultural land instead of discharging it into Whitaker Bayou. This second step would completely eliminate the discharge of Sarasota's treatment plant effluent into Sarasota Bay.

The grant process is divided into three general phases: planning, design, and construction. *See Fairview Township v. EPA,* 773 F.2d 517, 519–21 (3d Cir.1985) (describing the grant process). Sarasota submitted its proposed plan as a result of the first or planning phase of the process. The Florida Department of Environmental Regulation (FDER) certified Sarasota's plan to EPA as required by the grant process, subject to the stipulation "that the City of Sarasota spray irrigation site prove suitable as determined by the wasteload allocation."[2] EPA evaluated the spray irrigation portion of the project under then-applicable EPA "advanced treatment"[3] guidelines, *see* 44 Fed.Reg. 29,534 (1979), *superseded by* 49 Fed.Reg. 21,462 (1984), and concluded that the spray irrigation portion of Sarasota's proposed plan should be deferred until it could be determined whether the water quality benefits to Sarasota Bay could justify the cost of the spray irrigation project.[4] Consequently, EPA agreed to fund the second or design phase of the treatment plant expansion but withheld design funds for the spray irrigation portion of the project in favor of money to perform water quality studies of Sarasota Bay.

The first study of the Bay was performed by Priede-Sedgwick, Inc., a consulting engineering firm. Priede-Sedgwick concluded generally that water quality in the Bay was excellent with the exception of the area near the mouth of Whitaker Bayou. It also concluded that moving the Sarasota treatment plant outfall from its present Whitaker Bayou location to a more central and better-mixed area of the Bay would cause negligible water quality degradation in the Bay and would not violate state water quality standards. The report thus supported EPA's contention that the spray irrigation project was unjustified.

1. The Clean Water Act, more accurately referred to as the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251–1376, provides federal grants to reimburse municipalities for a portion of the costs of various wastewater treatment facilities. *See generally* 33 U.S.C. §§ 1281–1299.

2. A wasteload allocation is a determination of the quantity of waste that can be assimilated by a receiving water without violating water quality standards. *See* 33 U.S.C. § 1313(d).

3. Conventional or "secondary" treatment of municipal waste includes various physical treatment steps followed by bacterial degradation of the waste. So-called "advanced treatment" procedures include additional steps necessary to obtain a higher quality effluent, such as removal of nutrients, typically nitrogen.

4. The record reveals that EPA was concerned that the large capital cost of the proposed irrigation project was due to stringent state effluent quality requirements for coastal bay discharges and stringent pre-land application treatment requirements. EPA apparently suspected that neither of these state requirements could be justified on their technical merits. EPA also feared some of the anticipated environmental impacts of the spray irrigation project and questioned Sarasota's projected economic return from the agricultural production on the irrigated land.

FDER and Sarasota attacked numerous aspects of Priede-Sedgwick's study methodology and FDER performed an analysis of the Priede-Sedgwick data to develop its own wasteload allocation. FDER concluded that the continuing Whitaker Bayou discharge was unacceptable but it found that water quality considerations required only that Sarasota provide conventional treatment procedures [5] and a Bay discharge, provided that the discharge was located far enough offshore to ensure rapid dispersion of effluent. EPA endorsed FDER's conclusions (since they coincided with EPA's own) and indicated that it would use them to determine the eligibility for grant funding of Sarasota's proposed wastewater facilities.

Meanwhile, Sarasota hired a so-called "Expert Panel" to analyze the Priede-Sedgwick report and determine whether a Bay discharge would result in water quality violations. The Expert Panel concluded that although there was little concrete evidence to suggest that Sarasota's existing effluent discharge was affecting Bay marine life as a whole, a Bay discharge could produce "unacceptable" decreases in Bay water transparency and quality.[6] FDER forwarded the Expert Panel report to EPA without endorsing the study's results, although FDER did expand its earlier conclusion to concede that any effluent discharges into the Bay should occur more than 1800 feet from the mouth of Whitaker Bayou.

EPA's Region IV office in Atlanta reviewed this Expert Panel report, and took issue with many of its conclusions. The EPA regional office also stated that it would continue to rely on "previous studies of the Bay system," i.e., the FDER wasteload allocation, and that it would support federal funding only for conventional

waste treatment discharging to the Bay. About a month later, EPA's Washington office completed its own review of Sarasota's project. This review also concluded that Sarasota had failed to demonstrate that the city's effluent discharge was alone responsible for the loss of seagrass in Sarasota Bay or that eliminating the discharge from the Bay would significantly enhance the recovery of seagrass. In the opinion of the Washington office, the data did not indicate and the city could not establish that the treatment plant discharge rather than nonpoint source pollution (urban stormwater runoff, siltation from coastal development, etc.) had degraded the waters of the Bay.[7]

Following these reviews, EPA, Sarasota, and their respective consultants and staffs exchanged information in a series of communications designed to reach some kind of agreement. Sarasota also prevailed upon both of Florida's United States Senators and a Florida Congressman to exert pressure on EPA in support of the city's spray irrigation project. Unfortunately for Sarasota, however, EPA remained unfazed. On June 11, 1985, EPA formally completed its review of Sarasota's proposal with the conclusion that "the proposed removal of the discharge from the Sarasota Bay system lacks the water quality support related to seagrass improvement necessary for a favorable Federal funding decision."

Sarasota filed the instant suit on June 27, 1985, seeking numerous forms of relief. Sarasota asked for:

Declaratory judgments that

(i) a Bay discharge would be unlawful;

(ii) EPA's advanced treatment guidelines were (or alternatively, EPA's application of the advanced treatment guidelines was) unlawful under the APA for

---

5. See supra note 3.

6. Losses in transparency reduce the depth to which light will penetrate. This can cause the death of seagrass which provides the necessary shelter and environment for the propagation of marine life.

7. A review of the Priede-Sedgwick and Expert Panel reports prepared by EPA's consultant indi-

cated that the non-point source suspended solids loading in the Bay was ten times greater than the suspended solids loading from Sarasota's treatment plant. This means that the pollution from Sarasota's treatment plant represented only a small portion of the total pollution entering the Bay.

being arbitrary and capricious, an abuse of discretion, not in accordance with the Clean Water Act, and in excess of statutory authority;

Writs of mandamus compelling EPA to

(i) base its grant funding decisions only on "lawful alternatives";

(ii) modify Sarasota's permitted construction schedule in order to complete the advanced treatment review;

(iii) complete its grant funding review and approve Sarasota's entitlement to funds for spray irrigation project;

Preliminary injunctions preventing EPA from:

(i) committing Clean Water Act grant funds in the amount of the estimated project construction cost until the case is decided on the merits;

(ii) approving a Florida project funding priority list that does not include Sarasota's spray irrigation project;

(iii) interpreting Sarasota's acceptance or "rejectance" of state grant funds as a waiver of its right to federal grant funds;

(iv) interfering with Florida's certification of Sarasota's project.

On July 22, 1985, in response to a motion by EPA, the District Court dismissed Sarasota's action for lack of subject matter jurisdiction. The District Court held that Sarasota's ultimate goal was to receive grant funding, and therefore jurisdiction properly belonged in the Claims Court. *See United States v. City of Kansas City, Kansas,* 761 F.2d 605, 607–09 (10th Cir. 1985) (where plaintiff's ultimate aim is to obtain grant money in excess of $10,000, jurisdiction properly belongs in the Claims Court). EPA now appeals.

*Cleaning Out the Treasury*

The sole issue presented in this appeal is whether the Claims Court is the exclusive forum to hear the complaint of a federal grant applicant who challenges the criteria under which its application was rejected. At the outset, we observe that the Clean Water Act—the organic statute which authorized the type of grant sought by Sarasota—is silent on the subject of judicial review of grant decisions.[8] We must therefore be guided by more universal principles.

We start with the presumption that some kind of judicial review is available to Sarasota. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681, 686–87 (1967). Of course, the presumption favoring judicial review is merely a presumption and may be "overcome by specific language or specific legislative history that is a reliable indicator of congressional intent." *Block v. Community Nutrition Inst.,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270, 278 (1984). Such Congressional intent may be inferred from "contemporaneous judicial construction barring review and the congressional acquiescence in it," "the collective import of legislative and judicial history behind a particular statute," or "inference of intent drawn from the statutory scheme as a whole." *Id.*

In this case, we are certain that Congress did not intend to shield EPA Clean Water Act grant decisions from all judicial review. There is no indication in the statute that the Administrator's grant decisions—discretionary though they may be, *see* note 8—are committed solely to his discretion or are otherwise shielded from review. *See* 5 U.S.C. § 701(a). Our certainty is bolstered by the legislative history

---

**8.** The Clean Water Act contains a citizen suit provision, 33 U.S.C. § 1365, by which the EPA administrator may be sued in district court to compel him or her to perform nondiscretionary duties under the Act. We do not read this section as authorizing review of grant decisions, decisions which of necessity involve great amounts of discretion. *Cf. Concerned Citizens v.* *Costle,* 468 F.Supp. 21, 26 (E.D.Pa.1978) ("The [intervenor] cites no legislative history to suggest that [the citizens suit provision] was intended to apply to suits for money damages by grantees of [Clean Water Act] grants, and the Court has not located any."), *aff'd,* 592 F.2d 164 (3d Cir.1979).

of the 1976 amendments [9] to the Administrative Procedure Act, 5 U.S.C. §§ 701–706. These amendments were proposed "so as to remove the defense of sovereign immunity as a bar to judicial review of Federal Administrative action otherwise subject to judicial review." H.R.Rep. No. 1656, 94th Cong., 2d Sess. 1, *reprinted in* 1976 U.S. Code Cong. & Ad.News 6121, 6121. Among a list of types of cases to which the Congress wished to eliminate the defense of sovereign immunity was "administration of Federal grant-in-aid programs." *Id.* at 9, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 6129. Congress also is undoubtedly aware that these types of grant disputes traditionally have been heard in the federal courts. *See e.g., Dobbs v. Costle,* 559 F.2d 946 (5th Cir.1977). Indeed, EPA does not challenge the reviewability of the Administrator's decision not to fund Sarasota's spray irrigation project; EPA only challenges the forum in which Sarasota has sought that review.

Thus, given that review is available under the APA, we ordinarily would countenance Sarasota bringing its claims to the District Court for resolution under the general grant of jurisdiction over cases involving federal questions, 28 U.S.C. § 1331. *See Bell v. New Jersey,* 461 U.S. 773, 778 n. 3, 103 S.Ct. 2187, 2190 n. 3, 76 L.Ed.2d 312, 318 n. 3 (1983). EPA, however, asserts— and the District Court agreed—that since Sarasota's "prime objective" is to obtain some $22 million in federal grant funds, Sarasota's claims are in essence money claims that must be litigated in the Claims Court.

When faced with this or similar arguments, the federal courts have been forced to confront the murky doctrines that define the limits of Claims Court jurisdiction. Perhaps the most vigorous champion of EPA's "prime objective" position is the Tenth Circuit, whose opinions in *United States v. City of Kansas City, Kansas,* 761 F.2d 605 (10th Cir.1985), and *Amalgamated Sugar Co. v. Bergland,* 664 F.2d 818 (10th Cir.1981), directed federal grant claimants to the Claims Court. In *Kansas City,* the City of Kansas City resolved by consent decree a civil water pollution enforcement proceeding, and counterclaimed for more than $2 million in federal grant assistance which the city claimed was arbitrarily and capriciously denied by the federal government. The Court held that, since the city's claim was a monetary one, the city could not avoid Claims Court jurisdiction by attempting on appeal to recharacterize its claim as one seeking declaratory or injunctive relief. 761 F.2d at 608–09. In *Amalgamated Sugar,* two Utah sugar beet processors sought a declaratory judgment that certain sugar belonging to them was eligible for federal loans under a government price support program, and sought an injunction preventing the Secretary of Agriculture from recalling loans already made before their maturity date. By the time the case was argued on appeal, the processors had repaid the loan and the only remaining dispute between the parties was whether the government owed the processors some $700,000 in storage fees. The Court ordered the District Court to dismiss the case for lack of subject matter jurisdiction. That the complaint was cast in the form of declaratory relief could not defeat Claims Court jurisdiction when the only remaining controversy between the parties was the processors' $700,000 money claim. 664 F.2d at 823–24.

The District of Columbia Circuit in its recent opinion in *Maryland Department of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441 (D.C.Cir.1985), adopted a different approach. At issue in that case were social services training grant funds which the Department of Health and Human Services (HHS) claimed had been misspent by the Maryland Department of Human Resources. When the Maryland agency brought an action to enjoin HHS from withholding future funds as a set-off against the contested funds, the Court was confronted with whether judicial review of HHS's action in the District Court was

---

9. Pub.L. 94–574, 90 Stat. 2721 (1976).

foreclosed by the existence of Tucker Act jurisdiction in the Claims Court.[10] The Court held that Maryland's claims fell outside Claims Court jurisdiction because (1) the federal grant program involved could not be classified as a contractual undertaking within the meaning of the Tucker Act's jurisdiction over "express or implied contracts," and (2) the substantive law on which Maryland relied—Title XX of the Social Security Act, 42 U.S.C. §§ 1397–1397f—could not "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." This latter test has been held to be a prerequisite to recovery on a noncontractual claim under the Tucker Act. *See United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580, 591–92 (1983), *quoting United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114, 122 (1976). *Compare Army & Air Force Exch. Serv. v. Sheehan,* 456 U.S. 728, 738–41, 102 S.Ct. 2118, 2124–26, 72 L.Ed.2d 520, 529–30 (1982) (*Testan* held that Tucker Act noncontractual remedy is available only when damages claims against the United States have been authorized explicitly).

■ While we are not here prepared to reconcile these as well as other definitions of Claims Court jurisdiction, we can confidently state that, on the facts before us, this is not a case for the Claims Court. It is well established that Claims Court jurisdiction extends only to money claims against the United States. *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580, 591 (1983) ("claim must be one for money damages"); *Laguna Hermosa Corp. v. Martin,* 643 F.2d 1376, 1379 (9th Cir.1981) ("Tucker Act applies only to claims for money damages"); *Eastport S.S. Co. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967) ("The claim must, of course, be for money."); *see also* 5 U.S.C. § 702 (district court jurisdiction under the APA is limited to actions "seeking relief other than money damages"). Under the present posture of the grant process, however, Sarasota's claims [11] cannot be classified as money claims as that term is understood in Tucker Act jurisprudence.

■ Undoubtedly, Sarasota ultimately seeks money as the end product of the grant process,[12] but even if Sarasota can persuade a court of competent jurisdiction that EPA has impermissibly promulgated regulations and applied them to Sarasota's application, the best Sarasota can hope for in this litigation is a remand to EPA with

---

10. The Tucker Act, 28 U.S.C. § 1491, states in relevant part:

(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

11. While under certain circumstances a federal grant may take the form of a contract, thus giving rise to Claims Court jurisdiction when disputes arise, *see* 28 U.S.C. § 1491(a)(1), the present case is not such a circumstance. Under the terms of the Clean Water Act, no contractual rights vest in the grant applicant until the EPA Administrator approves "plans, specification, and estimates" for the proposed project. *See* 33 U.S.C. § 1283(a); *Fairview Township v. EPA,* 773 F.2d 517, 525 (3d Cir.1985); *Heart of the Valley Metropolitan Sewerage Dist. v. EPA,* 532 F.Supp. 314, 317–18 (E.D.Wis.1981). Obviously, no such approval has yet occurred here.

12. We believe it significant that the APA—the statute amended by Congress in 1976 to confer district court jurisdiction over grant disputes, *see* text at note 9—expressly does not apply to suits seeking money damages, *see* 5 U.S.C. § 702. By the 1976 amendment, Congress understood that disputes arising in the grant process need not automatically give rise to "money claims." *See also B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 727 (2d Cir.1983):

[If] all claims of wrongful action by federal officials involving more than $10,000 would have to be brought in the Claims Court[, that would] conflict with historic practice and with the plain intent of Congress in the 1976 amendments to § 702 of the APA and 28 U.S.C. § 1331 to make § 1331 the vehicle for actions "seeking relief other than money damages" for unlawful acts of federal agencies, officers or employees in cases where judicial review has not been expressly provided.

instructions to reconsider the application.[13] Resolution of the present controversy will not entitle Sarasota to federal grant funds nor even provide Sarasota with a declaration that Sarasota would be entitled to grant funds if the remaining steps in the grant process, such as preparation of an environmental assessment, are completed to EPA's satisfaction.

In this respect, we are in agreement with the result reached in *Fairview Township v. EPA*, 773 F.2d 517 (3d Cir.1985). In that case, the plaintiff township sought district court review of EPA's denial of grant funds to build a sewage treatment plant.[14] EPA asserted that victory for the plaintiff would be tantamount to a $14 million money judgment and that jurisdiction therefore belonged in the Claims Court. In rejecting EPA's assertion, the Court stated that "even if the district [court] were to conclude that EPA improperly applied the new guidelines, that court would only be able to determine which guidelines were the appropriate ones for EPA to use, and to direct EPA to reconsider [the plaintiff's] application based on the proper standards." *Id.* at 528–29. In a nutshell, the fact that Sarasota's victory on its present claim, if it occurs, may advance it along the path to the grant funding that it covets does not automatically transform every intervening controversy into a Tucker Act claim. *See Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981) ("a district court does not lose jurisdiction over a claim for non-monetary relief simply because it may later be the basis for a money judgment.") (citing cases); *compare Maryland Dep't of Human Resources v. Department of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C.Cir.1985) (even if plaintiff succeeds on its claim and the federal government is forced to pay money as a result, the nature of the relief sought may be classified as specific, not monetary, relief in some instances).

### Conclusion

We therefore reverse the District Court in holding that the Claims Court was the proper forum for Sarasota's suit to be heard. We sympathize with EPA's wish to concentrate all of its grant cases in the Claims Court where, presumably, the agency will not be subject to inconsistent verdicts from different areas of the country. However, a drastic redefinition of Claims Court jurisdiction, such as EPA proposes here, must come from Congress, not from this Court.

REVERSED AND REMANDED.

**13.** Despite the ambitious relief requested in Sarasota's complaint, judicial review of EPA's action is limited to whether the review standards applied by the agency were the correct ones and, if so, whether the agency abused its discretion in denying funding for Sarasota's spray irrigation project. No judgment for money relief, nor any order requiring payment of any sum, may be entered. Should a claim properly cognizable in the Claims Court subsequently arise in this litigation, the District Court may sever that claim and transfer it to the Claims Court. *See* 28 U.S.C. § 1406(c); *United States v. O'Neil*, 767 F.2d 1111, 1113 (5th Cir.1985).

**14.** Although the facts of the *Fairview Township* case and the present case sound similar, the specific claims that the different municipalities raised in support of their alleged entitlement to funds are quite different.