BLOCK, SECRETARY OF AGRICULTURE, ET AL. *v.*
COMMUNITY NUTRITION INSTITUTE ET AL.

No. 83–458.   Argued April 24, 1984—Decided June 4, 1984

*Kathryn A. Oberly* argued the cause for petitioners. With her on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller,* and *Leonard Schaitman.*

*Ronald L. Plesser* argued the cause for respondents. With him on the brief were *Janie A. Kinney, Alan R. Schwartz, William B. Schultz,* and *Alan B. Morrison.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the question whether ultimate consumers of dairy products may obtain judicial review of milk market orders issued by the Secretary of Agriculture (Secretary) under the authority of the Agricultural Marketing Agreement Act of 1937 (Act), ch. 296, 50 Stat. 246, as amended, 7 U. S. C. § 601 *et seq.* We conclude that consumers may not obtain judicial review of such orders.

I

A

In the early 1900's, dairy farmers engaged in intense competition in the production of fluid milk products. See *Zuber* v. *Allen,* 396 U. S. 168, 172–176 (1969). To bring this destabilizing competition under control, the 1937 Act authorizes the Secretary to issue milk market orders setting the minimum prices that handlers (those who process dairy products)

must pay to producers (dairy farmers) for their milk products. 7 U. S. C. § 608c. The "essential purpose [of this milk market order scheme is] to raise producer prices," S. Rep. No. 1011, 74th Cong., 1st Sess., 3 (1935), and thereby to ensure that the benefits and burdens of the milk market are fairly and proportionately shared by all dairy farmers. See *Nebbia* v. *New York*, 291 U. S. 502, 517–518 (1934).

Under the scheme established by Congress, the Secretary must conduct an appropriate rulemaking proceeding before issuing a milk market order. The public must be notified of these proceedings and provided an opportunity for public hearing and comment. See 7 U. S. C. § 608c(3). An order may be issued only if the evidence adduced at the hearing shows "that [it] will tend to effectuate the declared policy of this chapter with respect to such commodity." 7 U. S. C. § 608c(4). Moreover, before any market order may become effective, it must be approved by the handlers of at least 50% of the volume of milk covered by the proposed order and at least two-thirds of the affected dairy producers in the region. 7 U. S. C. §§ 608c(8), 608c(5)(B)(i). If the handlers withhold their consent, the Secretary may nevertheless impose the order. But the Secretary's power to do so is conditioned upon at least two-thirds of the producers consenting to its promulgation and upon his making an administrative determination that the order is "the only practical means of advancing the interests of the producers." 7 U. S. C. § 608c(9)(B).

The Secretary currently has some 45 milk market orders in effect. See 7 CFR pts. 1001–1139 (1984). Each order covers a different region of the country, and collectively they cover most, though not all, of the United States. The orders divide dairy products into separately priced classes based on the uses to which raw milk is put. See 44 Fed. Reg. 65990 (1979). Raw milk that is processed and bottled for fluid consumption is termed "Class I" milk. Raw milk that is used to

produce milk products such as butter, cheese, or dry milk powder is termed "Class II" milk.[1]

For a variety of economic reasons, fluid milk products would command a higher price than surplus milk products in a perfectly functioning market. Accordingly, the Secretary's milk market orders require handlers to pay a higher order price for Class I products than for Class II products. To discourage destabilizing competition among producers for the more desirable fluid milk sales, the orders also require handlers to submit their payments for either class of milk to a regional pool. Administrators of these regional pools are then charged with distributing to dairy farmers a weighted average price for each milk product they have produced, irrespective of its use. See 7 U. S. C. § 608c(5)(B)(ii).

In particular, the Secretary has regulated the price of "reconstituted milk"—that is, milk manufactured by mixing milk powder with water—since 1964. See 29 Fed. Reg. 9002, 9010 (1964); see also 34 Fed. Reg. 16548, 16551 (1969). The Secretary's orders assume that handlers will use reconstituted milk to manufacture surplus milk products. Handlers are therefore required to pay only the lower Class II minimum price. See 44 Fed. Reg. 65989, 65990 (1979). However, handlers are required to make a "compensatory payment" on any portion of the reconstituted milk that their records show has not been used to manufacture surplus milk products. 7 CFR §§ 1012.44(a)(5)(i), 1012.60(e) (1984). The compensatory payment is equal to the difference between the Class I and Class II milk product prices. Handlers make these payments to the regional pool, from which moneys are then distributed to producers of fresh fluid milk in the region where the reconstituted milk was manufactured and sold. § 1012.71(a)(1).

---

[1] Under many orders, milk is divided into three classes. For purposes of this case, however, all milk other than milk used for fluid purposes is referred to as Class II milk.

## B

In December 1980, respondents brought suit in District Court, contending that the compensatory payment requirement makes reconstituted milk uneconomical for handlers to process.[2] Respondents, as plaintiffs in the District Court, included three individual consumers of fluid dairy products, a handler regulated by the market orders, and a nonprofit organization. The District Court concluded that the consumers and the nonprofit organization did not have standing to challenge the market orders. In addition, it found that Congress had intended by the Act to preclude such persons from obtaining judicial review. The District Court dismissed the milk handler's complaint because he had failed to exhaust his administrative remedies.

The Court of Appeals affirmed in part and reversed in part, and remanded the case for a decision on the merits. 225 U. S. App. D. C. 387, 698 F. 2d 1239 (1983). The Court of Appeals agreed that the milk handler and the nonprofit organization had been properly dismissed by the District Court. But the court concluded that the individual consumers had standing: they had suffered an injury-in-fact,

---

[2] Prior to filing suit, respondents petitioned the Secretary to hold a rulemaking hearing to amend the market orders so that reconstituted milk would no longer be subject to the compensatory payment rule. See 44 Fed. Reg. 65989 (1979). The Secretary published a Notice of Request and asked for comments. *Ibid.* Subsequently, the Secretary published a preliminary impact analysis of the proposal and invited comments. See 45 Fed. Reg. 75956 (1980). In April 1981, after respondents had filed suit in the District Court, the Secretary determined not to hold a rulemaking hearing because respondents' proposal would not further the purposes of the Act. See App. 57–63. The portion of respondents' complaint challenging the Secretary's inaction on their rulemaking request was held moot by the Court of Appeals. 225 U. S. App. D. C. 387, 403, and n. 93, 698 F. 2d 1239, 1255, and n. 93 (1983). Respondents did not cross-petition for certiorari review of this issue, and we therefore have no occasion to consider it.

their injuries were redressable, and they were within the zone of interests arguably protected by the Act. The Court also concluded that the statutory structure and purposes of the Act did not reveal "the type of clear and convincing evidence of congressional intent needed to overcome the presumption in favor of judicial review." *Id.*, at 400, and n. 75, 698 F. 2d, at 1252, and n. 75. The Court of Appeals expressly refused to follow the decision of the Ninth Circuit in *Rasmussen* v. *Hardin*, 461 F. 2d 595, cert. denied *sub nom. Rasmussen* v. *Butz*, 409 U. S. 933 (1972), which had held consumers precluded by statute from seeking judicial review.

We granted certiorari to resolve the conflict in the Circuits. 464 U. S. 991 (1983). We now reverse the judgment of the Court of Appeals in this case.

## II

Respondents filed this suit under the Administrative Procedure Act (APA), 5 U. S. C. § 701 *et seq.* The APA confers a general cause of action upon persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U. S. C. § 702, but withdraws that cause of action to the extent the relevant statute "preclude[s] judicial review," 5 U. S. C. § 701(a)(1). Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved. See *Southern R. Co.* v. *Seaboard Allied Mining Corp.*, 442 U. S. 444, 454–463 (1979); *Morris* v. *Gressette*, 432 U. S. 491, 499–507 (1977); see generally Note, Statutory Preclusion of Judicial Review Under the Administrative Procedure Act, 1976 Duke L. J. 431, 442–449. Therefore, we must examine this statutory scheme "to determine whether Congress precluded all judicial review, and, if not, whether Congress nevertheless foreclosed review to the class to which the [re-

spondents] belon[g]." *Barlow* v. *Collins*, 397 U. S. 159, 173 (1970) (opinion of BRENNAN, J.,); see also *Data Processing Service* v. *Camp*, 397 U. S. 150, 156 (1970).

It is clear that Congress did not intend to strip the judiciary of all authority to review the Secretary's milk market orders. The Act's predecessor, the Agricultural Adjustment Act of 1933, 48 Stat. 31, contained no provision relating to administrative or judicial review. In 1935, however, Congress added a mechanism by which dairy handlers could obtain review of the Secretary's market orders. 49 Stat. 760. That mechanism was retained in the 1937 legislation and remains in the Act as § 608c(15) today. Section 608c(15) requires handlers first to exhaust the administrative remedies made available by the Secretary. 7 U. S. C. § 608c(15)(A); see 7 CFR §§ 900.50–900.71 (1984). After these formal administrative remedies have been exhausted, handlers may obtain judicial review of the Secretary's ruling in the federal district court in any district "in which [they are] inhabitant[s], or ha[ve their] principal place[s] of business." 7 U. S. C. § 608c(15)(B). These provisions for handler-initiated review make evident Congress' desire that *some* persons be able to obtain judicial review of the Secretary's market orders.

The remainder of the statutory scheme, however, makes equally clear Congress' intention to limit the classes entitled to participate in the development of market orders. The Act contemplates a cooperative venture among the Secretary, handlers, and producers the principal purposes of which are to raise the price of agricultural products and to establish an orderly system for marketing them. Handlers and producers—but not consumers—are entitled to participate in the adoption and retention of market orders. 7 U. S. C. §§ 608c(8), (9), (16)(B). The Act provides for agreements among the Secretary, producers, and handlers, 7 U. S. C. § 608(2), for hearings among them, §§ 608(5), 608c(3), and for votes by producers and handlers, §§ 608c(8)(A), (9)(B), (12),

608c(19). Nowhere in the Act, however, is there an express provision for participation by consumers in any proceeding. In a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process. See *Switchmen* v. *National Mediation Board*, 320 U. S. 297, 305–306 (1943); cf. *United States* v. *Erika, Inc.*, 456 U. S. 201, 208 (1982).

To be sure, the general purpose sections of the Act allude to general consumer interests. See 7 U. S. C. §§ 602(2), (4). But the preclusion issue does not only turn on whether the interests of a particular class like consumers are implicated. Rather, the preclusion issue turns ultimately on whether Congress intended for that class to be relied upon to challenge agency disregard of the law. See *Barlow* v. *Collins, supra*, at 167. The structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized.

Respondents would have us believe that, while Congress unequivocally directed handlers first to complain to the Secretary that the prices set by milk market orders are too high, it was nevertheless the legislative judgment that the same challenge, if advanced by consumers, does not require initial administrative scrutiny. There is no basis for attributing to Congress the intent to draw such a distinction. The regulation of agricultural products is a complex, technical undertaking. Congress channelled disputes concerning marketing orders to the Secretary in the first instance because it believed that only he has the expertise necessary to illuminate and resolve questions about them. Had Congress intended to allow consumers to attack provisions of marketing orders, it surely would have required them to pursue the administrative remedies provided in § 608c(15)(A) as well. The restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders.

Allowing consumers to sue the Secretary would severely disrupt this complex and delicate administrative scheme. It would provide handlers with a convenient device for evading the statutory requirement that they first exhaust their administrative remedies. A handler may also be a consumer and, as such, could sue in that capacity. Alternatively, a handler would need only to find a consumer who is willing to join in or initiate an action in the district court. The consumer or consumer-handler could then raise precisely the same exceptions that the handler must raise administratively. Consumers or consumer-handlers could seek injunctions against the operation of market orders that "impede, hinder, or delay" enforcement actions, even though such injunctions are expressly prohibited in proceedings properly instituted under 7 U. S. C. § 608c(15). Suits of this type would effectively nullify Congress' intent to establish an "equitable and expeditious procedure for testing the validity of orders, without hampering the Government's power to enforce compliance with their terms." S. Rep. No. 1011, 74th Cong., 1st Sess., 14 (1935); see also *United States* v. *Ruzicka,* 329 U. S. 287, 293–294, and n. 3 (1946). For these reasons, we think it clear that Congress intended that judicial review of market orders issued under the Act ordinarily be confined to suits brought by handlers in accordance with 7 U. S. C. § 608c(15).

### III

The Court of Appeals viewed the preclusion issue from a somewhat different perspective. First, it recited the presumption in favor of judicial review of administrative action that this Court usually employs. It then noted that the Act has been interpreted to authorize producer challenges to the administration of market order settlement funds, see *Stark* v. *Wickard,* 321 U. S. 288 (1944), and that no legislative history or statutory language directly and specifically supported the preclusion of consumer suits. In these circumstances, the Court of Appeals reasoned that the Act could not fairly be

interpreted to overcome the presumption favoring judicial review and to leave consumers without a judicial remedy. See 225 U. S. App. D. C., at 400, and n. 75, 698 F. 2d, at 1252, and n. 75. We disagree with the Court of Appeals' analysis.

The presumption favoring judicial review of administrative action is just that—a presumption. This presumption, like all presumptions used in interpreting statutes, may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent. See, *e. g.*, *Southern R. Co.* v. *Seaboard Allied Milling Corp.*, 442 U. S., at 454–463; *Schilling* v. *Rogers*, 363 U. S. 666, 670–677 (1960). The congressional intent necessary to overcome the presumption may also be inferred from contemporaneous judicial construction barring review and the congressional acquiescence in it, see, *e. g.*, *Ludecke* v. *Watkins*, 335 U. S. 160 (1948), or from the collective import of legislative and judicial history behind a particular statute, see, *e. g.*, *Heikkila* v. *Barber*, 345 U. S. 229 (1953). More important for purposes of this case, the presumption favoring judicial review of administrative action may be overcome by inferences of intent drawn from the statutory scheme as a whole. See, *e. g.*, *Morris* v. *Gressette*, 432 U. S. 491 (1977); *Switchmen* v. *National Mediation Board*, 320 U. S. 297 (1943). In particular, at least when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded. See *Barlow* v. *Collins*, 397 U. S., at 168, and n. 2, 175, and n. 9 (opinion of BRENNAN, J.); *Switchmen* v. *National Mediation Board, supra*, at 300–301; cf. *Associated General Contractors of California, Inc.* v. *Carpenters*, 459 U. S. 519, 542 (1983).

A case that best illustrates the relevance of a statute's structure to the Court's preclusion analysis is *Morris* v. *Gressette, supra*. In that case, the Court held that the Attorney General's failure to object to a change in voting

procedures was an unreviewable administrative determination under the Voting Rights Act of 1965. Neither the Voting Rights Act nor its legislative history said anything about judicial review. Nevertheless, the *Morris* Court concluded that the "nature of the [statutory] remedy . . . strongly suggests that Congress did not intend the Attorney General's actions under that provision to be subject to judicial review." *Id.*, at 501. The Court reasoned that Congress had intended the approval procedure to be expeditious and that reviewability would unnecessarily extend the period the State must wait for effecting its change. *Id.*, at 504–505. The Court also found relevant the existence of other remedies to ensure the realization of the Voting Rights Act's objectives. *Id.*, at 505–507. In these circumstances, even though proof of specific congressional intent was not "clear and convincing" in the traditional evidentiary sense, the Court unremarkably found the intent to preclude judicial review implicit in the statutory scheme.

In this case, the Court of Appeals did not take the balanced approach to statutory construction reflected in the *Morris* opinion. Rather, it recited this Court's oft-quoted statement that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 141 (1967). See also *Southern R. Co.* v. *Seaboard Allied Milling Corp.*, *supra*, at 462; *Dunlop* v. *Bachowski*, 421 U. S. 560, 568 (1975). According to the Court of Appeals, the "clear and convincing evidence" standard required it to find unambiguous proof, in the traditional evidentiary sense, of a congressional intent to preclude judicial review at the consumers' behest. Since direct statutory language or legislative history on this issue could not be found, the Court of Appeals found the presumption favoring judicial review to be controlling.

This Court has, however, never applied the "clear and convincing evidence" standard in the strict evidentiary sense the

Court of Appeals thought necessary in this case. Rather, the Court has found the standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is "fairly discernible in the statutory scheme." *Data Processing Service* v. *Camp*, 397 U. S., at 157. In the context of preclusion analysis, the "clear and convincing evidence" standard is not a rigid evidentiary test but a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling. That presumption does not control in cases such as this one, however, since the congressional intent to preclude judicial review is "fairly discernible" in the detail of the legislative scheme. Congress simply did not intend for consumers to be relied upon to challenge agency disregard of the law.

It is true, as the Court of Appeals also noted, that this Court determined, in *Stark* v. *Wickard*, 321 U. S. 288 (1944), that dairy producers could challenge certain administrative actions even though the Act did not expressly provide them a right to judicial review. The producers challenged certain deductions the Secretary had made from the "producer settlement fund" established in connection with the milk market order in effect at the time. "[T]he challenged deduction[s] reduce[d] *pro tanto* the amount actually received by the producers for their milk." *Id.*, at 302. These deductions injured what the producers alleged were "definite personal rights" that were "not possessed by the people generally," *id.*, at 304, 309, and gave the producers standing to object to the administration of the settlement fund. See *id.*, at 306. Though the producers' standing could not by itself ensure judicial review of the Secretary's action at their behest, see *ibid.*, the statutory scheme as a whole, the Court concluded, implicitly authorized producers' suits concerning settlement fund administration. See *id.*, at 309–310. "[H]andlers [could not] question the use of the fund, because handlers had

no financial interest in the fund or its use." *Id.*, at 308. Thus, there was "no forum" in which this aspect of the Secretary's actions could or would be challenged. Judicial review of the producers' complaint was therefore necessary to ensure achievement of the Act's most fundamental objectives— to wit, the protection of the producers of milk and milk products.

By contrast, preclusion of consumer suits will not threaten realization of the fundamental objectives of the statute. Handlers have interests similar to those of consumers. Handlers, like consumers, are interested in obtaining reliable supplies of milk at the cheapest possible prices. See *Zuber* v. *Allen*, 396 U. S., at 190. Handlers can therefore be expected to challenge unlawful agency action and to ensure that the statute's objectives will not be frustrated.[3] Indeed, as noted above, consumer suits might themselves frustrate achievement of the statutory purposes. The Act contemplates a cooperative venture among the Secretary, producers, and handlers; consumer participation is not provided for or desired under the complex scheme enacted by Congress. Consumer suits would undermine the congressional preference for administrative remedies and provide a mechanism for disrupting administration of the congressional scheme. Thus, preclusion of consumer suits is perfectly consistent with the Court's contrary conclusion concerning producer challenges in *Stark* v. *Wickard* and its analogous conclusion concerning voter challenges in *Morris* v. *Gressette*.

## IV

The structure of this Act implies that Congress intended to preclude consumer challenges to the Secretary's market orders. Preclusion of such suits does not pose any threat to

---

[3] Whether handlers would pass on to consumers any savings they might secure through a successful challenge to the market order provisions is irrelevant. Consumers' interest in market orders is limited to lowering the prices charged to handlers in the hope that consumers will then reap some benefit at the retail level.

realization of the statutory objectives; it means only that those objectives must be realized through the specific remedies provided by Congress and at the behest of the parties directly affected by the statutory scheme.[4]   Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE STEVENS took no part in the decision of this case.

---

[4] The conclusion that Congress intended to preclude consumers from seeking judicial review of the Secretary's market orders avoids any pronouncement on the merits of respondents' substantive claims.   Since congressional preclusion of judicial review is in effect jurisdictional, we need not address the standing issues decided by the Court of Appeals in this case.   See *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 456 (1974); see also *id.*, at 465, and n. 13.