Charles H. DEAN, Jr., et al., Plaintiffs,

v.

John S. HERRINGTON, et al., Defendants.

TENNESSEE VALLEY PUBLIC POWER ASSOCIATION, et al., Plaintiffs,

v.

John S. HERRINGTON, et al., Defendants.

Civ. Nos. 3–87–436, 3–87–439.

United States District Court, E.D. Tennessee, N.D.

Aug. 4, 1987.

As Corrected Aug. 11, 1987.

Edward S. Christenbury, Gen. Counsel, James E. Fox, Deputy Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Robert C. Glinski, Asst. Gen. Counsel, Peter K. Shea, Sr., Litigation Atty., John P. Kernodle, Tennessee Valley Authority, Knoxville, Tenn. for plaintiffs in Civ. No. 3–87–436.

Don C. Stansberry, Jr., Baker, Worthington, Crossley, Stansberry & Woolf, Huntsville, Tenn., for intervenor Tennessee Valley Indus. Corp.

Carolyn Jourdan, Chief Counsel, Committee on Govt. Affairs, Washington, D.C., for amicus curiae Senator James R. Sasser.

Senator Albert Gore, Bill Boner, Jim Cooper, Bart Gordon, Ed Jones, and Don Sundquist, U.S. Representatives, amicus curiae.

J. Christopher Kohn, John W. Showalter, Allen L. Lear, Dept. of Justice, Washington, D.C., John Gill, U.S. Atty., for defendants.

David Darugh, Dept. of Energy, Oak Ridge, Tenn., for Dept. of Energy.

Carlos C. Smith, Frederick L. Hitchcock, Edward D. Meyer, Strang, Fletcher, Carriger, Walter, Hodge & Smith, Chattanooga, Tenn., for plaintiffs in Civ. No. 3–87–439.

## MEMORANDUM OPINION

JARVIS, District Judge.

These two consolidated actions arise out of two long-term power contracts entered into between two federal government agencies, the Tennessee Valley Authority (hereinafter "TVA") and the Department of Energy (hereinafter "DOE").

DOE has notified TVA of its refusal to make certain payments allegedly due under these contracts. In Civil Action No. 3–87–436, TVA, Charles H. Dean, Jr., Chairman of TVA's Board of Directors, and John B. Waters, a member of the Board of Directors, have sued DOE, John S. Herrington, the Secretary of the DOE, and John R. Longenecker, a Deputy Assistant Secretary of the DOE, for "declaratory and injunctive relief." The complaint alleges that the "defendants are proceeding with an arbitrary, capricious, bad faith, *ultra vires,* and unlawful course of conduct in refusing to pay the applicable rates set by plaintiffs Dean and Waters as the TVA Board of Directors pursuant to the TVA Act (16 U.S.C. §§ 831–831(dd))" and in "attempting themselves to set other and lower rates in violation of the TVA Act (42 U.S.C. § 2204), and DOE's power contracts entered into under the statutes." Plaintiffs seek the following relief: (1) a declaratory judgment that the actions taken by the defendants are arbitrary, capricious, in bad faith, *ultra vires,* and unlawful; and (2) a declaratory judgment that DOE be required to pay the rates established by the TVA Board of Directors as agreed under the power contracts. By way of amended complaint, TVA also seeks a writ of mandamus pursuant to 28 U.S.C. § 1361 requiring defendants Longenecker and Harrington to take steps to assure that the amounts allegedly owed are paid. TVA also seeks a preliminary injunction enjoining the defendants from withholding amounts due under the contracts.

Civil Action No. 3–87–439 is brought by four distributor corporations of TVA power against DOE, Herrington and Longenecker. The complaint seeks an injunction barring the "continued unlawful acts of defendants in refusing to pay sums appropriated by Congress and legally due under certain contracts" between TVA and DOE. The gist of the complaint is that if DOE is able to avoid its liability under its contracts with TVA, TVA will be forced to shift those obligations to other ratepayers and their rates will be increased by 6%. These plaintiffs seek an injunction requiring the defendants to fulfill their obligations under

the contracts, enjoining the defendants from any attempts to shift their obligations to the ratepayers and/or distributors, and enjoining them from interfering with the duties of the Directors of the TVA Board of Directors, contrary to the provisions of the TVA Act (apparently those provisions dealing with TVA's ratemaking authority).

On June 18, 1987, the Tennessee Valley Industrial Corporation (hereinafter "TVIC") filed a motion for leave to intervene in Civil Action No. 3–87–436 pursuant to Rule 24(b), Fed.R.Civ.P., seeking the same declaratory and injunctive relief sought by TVA. On July 1, 1987, TVIC's motion to intervene was granted. On July 23, 1987, the Aluminum Company of America (hereinafter "Alcoa") filed a similar motion to intervene.

Currently pending is Alcoa's motion to intervene in Civil Action No. 3–87–436, DOE's motion to dismiss both actions pursuant to Rule 12(b), Fed.R.Civ.P., and the motions for a preliminary injunction of the TVA and the TVIC.

The Court will consider first DOE's motions to dismiss the complaints. DOE contends that (1) with respect to TVA, this action does not involve a justiciable controversy as it represents an internal dispute between two Executive agencies; (2) alternatively, this Court lacks subject matter jurisdiction over what is essentially a breach of contract action between TVA and DOE, over which exclusive jurisdiction rests in the United States Claims Court; (3) the plaintiffs and intervenors other than TVA lack standing to bring these actions or participate as parties; (4) the Court lacks *in personam* jurisdiction over defendants Herrington and Longenecker; and (5) the complaints fail to state a claim against defendants Longenecker and Herrington.

### I. *Factual Background.*

DOE operates uranium enrichment facilities at Oak Ridge, Tennessee and Paducah, Kentucky as the successor to the Atomic Energy Commission. TVA has made electric power available to the Oak Ridge facilities since World War II and to the Paducah facilities since 1951.

TVA alleges that in the late 1960's DOE was expecting tremendous increases in production at its uranium enrichment and other plants at Oak Ridge and Paducah, and approached TVA regarding making very large amounts of power available. TVA says that DOE could have undertaken the significant risks associated with building its own generating facilities or could have entered into arrangements whereby TVA would build and dedicate specific generating plants to the DOE projects, but it chose not to. Instead, TVA asserts that DOE asked and TVA agreed to enter into contractual arrangements which would make TVA electricity available to DOE's facilities from the TVA system generally.

The resulting contracts, dated December 1, 1967 and effective April 1, 1971, required TVA to make available large amounts of electric power to the Oak Ridge and Paducah facilities. The Oak Ridge contract was titled "Oak Ridge Power Contract Between United States of American Acting By and Through United States Atomic Energy Commission and Tennessee Valley Authority." [*See* Exhibit "A" to TVA's Complaint]. The Paducah contract was similarly titled. [*See* Exhibit "B" to TVA's Complaint]. The contracts were amended in November, 1968, to increase in steps to 3,165,000 kilowatts the total amount of power required to be made available by TVA. Further increases in the total of kilowatts to be required were made in 1973 and 1974. The DOE contracts are "availability" contracts; that is, they obligate TVA to make power available, without obligating DOE to actually use any particular amount.

Each of the DOE contracts provides that it will continue through June, 1990, and from year to year thereafter through June, 1999, unless terminated earlier by either party upon notice of a reduction to zero (in successive steps of not more than 1,000,000 kilowatts per year beginning no earlier than eight (8) years after notice) of the aggregate amount to be made available. In a series of notification letters to TVA dated December 24, 1981, December 20, 1982, December 23, 1983, December 24, 1984, and March 7, 1986, DOE exercised its

right under the contracts to reduce the aggregate contract demand to zero kilowatts, thus terminating the contracts effective March, 1994. As written, the contracts require DOE to pay the applicable demand charges, as well as energy and customer charges, until the termination becomes effective, regardless of the amount of power DOE is actually using. Such charges constitute DOE's minimum payment obligation.

TVA insists that such minimum payment contracts are necessitated by the large capital investments which TVA undertook in guaranteeing such large amounts of electrical power to DOE. It is beyond dispute that the TVA Board of Directors has exclusive power to set TVA's rates, and that the setting of these rates is not subject to judicial review. *See Mobil Oil Corp. v. Tennessee Valley Authority,* 387 F.Supp. 498 (N.D.Ala.1974). Moreover, it is also beyond dispute that these minimum bill provisions are not liquidated damage or penalty provisions subject to judicial review as to reasonableness, but rather are considered integral portions of the rates which TVA has fixed pursuant to express Congressional authority. *See id.; Carborundum Company v. TVA,* 521 F.Supp. 590 (E.D.Tenn.1981).

On June 10, 1987, defendant Longenecker, DOE's Deputy Assistant Secretary for Uranium Enrichment, sent a letter to TVA's General Manager informing TVA that DOE had decided to withhold payment of increasingly large portions of its contractual capacity charges. The letter stated that DOE would pay only 90% of the charges for June, 1987, 80% for July, 1987, 70% for August, 1987, 60% for September, 1987, and that beginning with the October, 1987 payment, DOE would pay only 50% of the monthly charges for capacity not being used under the contracts. [A 50% withholding at TVA's current power rate would amount to something over $21 million per month]. TVA alleges that the defendants have already withheld part of the payment of DOE's most recent power bill. On June 16, 1987, TVA filed Civil Action No. 3–87–436.

## II. *Justiciability of TVA's Complaint.*

DOE first alleges that TVA's complaint must be dismissed since it does not set forth a justiciable claim. The gist of this argument is that the Judiciary cannot exercise jurisdiction over an internal dispute between two Executive Branch agencies. DOE also argues as an aspect of its justiciability argument that an Executive Order of President Carter, No. 12146, requires TVA as a matter of law to submit its dispute with DOE to the Attorney General of the United States for final and binding resolution.

Article III of the Constitution confines federal courts to adjudicating actual "cases and controversies". The "case or controversy" doctrine places fundamental limits on the exercise of federal judicial power in our system of government. The Supreme Court has observed:

> All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like relate in part, and in different though overlapping ways, to an idea, which is more than intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our government.

*Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), *quoting, Vander Jagt v. O'Neill,* 226 U.S.App.D.C. 14, 26–27, 699 F.2d 1166, 1178–79 (1983) (Bork, J., concurring). In considering the justiciability argument advanced by DOE, the Court has found guidance in the following four cases.

In *United States v. ICC,* 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), the United States, as a shipper, asked several railroads to make allowances for certain expenses it incurred at certain piers and the railroads refused. The United States filed a complaint with the Interstate Commerce Commission (hereinafter "ICC") and the ICC ruled against the United States. The United States then sued in the district court to set aside the ICC's order. The ICC and the United States itself were made defendants. In considering the justiciability of such a

claim, the Supreme Court noted the general principal that "no person may sue himself", and that courts only adjudicated justiciable controversies. The Court observed:

> While this case is *United States v. United States, et al.*, it involves controversies of a type which are traditionally justiciable. The basic question is whether railroads have illegally exacted sums of money from the United States.

*Id.* at 430, 69 S.Ct. at 1413. While the exact holding of the *ICC* case appears to be that the railroads, rather than the ICC, were the real parties in interest in that action, the case illustrates that the courts must look behind the name that symbolizes the parties to determine whether a justiciable controversy is presented. It also illustrates that, at least under some circumstances, one agency of the Executive may sue another and have a justiciable controversy.

The second important case considered is the decision of the late Judge Frank Wilson of this court in *United States v. Easement and Right of Way Over Certain Land in Bedford County, Tennessee*, 204 F.Supp. 837 (E.D.Tenn.1962). In that case, TVA, in a condemnation suit, sought to enjoin the Farmers Home Administration (hereinafter "FmHA") as a party defendant on the ground that the FmHA held a mortgage or security interest in the land over which TVA sought to acquire an easement. In granting the FmHA's motion to dismiss, Judge Wilson held:

> It appears to the Court that there could not be any issue between the TVA and the FmHA, both being the United States, which this Court could litigate or adjudicate. Any differences between these agencies would at most be inter-agency disputes which are not subject to settlement by adjudication.

*Id.* at 839. Judge Wilson distinguished the *ICC* case on the ground that the actual holding there was not that one government agency could sue another in federal court, but that the railroads rather than the United States were the real parties in interest as defendants.

I am of the opinion that recent Supreme Court decisions call into question the continuing vitality of Judge Wilson's decision. In *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), a special prosecutor, Leon Jaworski, sought to enforce against President Nixon a subpoena *duces tecum*. President Nixon's counsel argued that the dispute was not justiciable, but was essentially a "jurisdictional" dispute within the Executive Branch. In a unanimous opinion, the Supreme Court rejected that argument:

> The mere assertion of a claim of intrabranch dispute, without more, has never operated to defeat federal jurisdiction; justiciability does not depend on such a surface inquiry. In *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), the Court observed, "courts must look behind the names that symbolize the parties to determine whether a justiciable case or controversy is presented." [citations omitted].

.     .     .     .     .

> In the constitutional sense, controversy means more than disagreement and conflict; rather, it means the kind of controversy courts traditionally resolve. Here at issue if the production or nonproduction of specified evidence deemed by the special prosecutor to be relevant and admissible in a pending criminal case. It is sought by one official of the Executive Branch within the scope of his express authority; it is resisted by the Chief Executive on the ground of his duty to preserve the confidentiality of the communications of the President. Whatever the correct answer on the merits, these are issues *"of a type which are traditionally justiciable."*

*Id.*, at 696–97, 94 S.Ct. at 3101–02 [emphasis supplied]. The Court also noted that the issues were raised in a setting that assured "concrete adverseness" of the parties and concluded that a justiciable controversy was presented for decision. *Id.*

The *Nixon* decision is followed in *United States v. Federal Maritime Commission*, 694 F.2d 793 (D.C.Cir.1982), wherein it is recognized that a dispute between the Unit-

ed States and the Federal Maritime Commission, *even assuming that the real parties in interest were the United States and the Federal Maritime Commission,* may present a justiciable controversy where it is of a type traditionally justiciable and raised in a setting that assures concrete adverseness of the parties. *Id.* at 810.

This Court is of the opinion that the *Nixon* case is controlling on the question of the justiciability of TVA's claim. The claim raised is of a type traditionally thought to be justiciable: stripped of its surplusage it is essentially a breach of contract claim. It is also raised in a setting that assures "concrete adverseness" of the parties. The Court observes that TVA's unique independence as a federal agency sharpens this adverseness.[1]

This case, however, does present a complicating factor. In considering justiciability under Article III, the Supreme Court has stressed that the law of justiciability is based upon the concept of separation of powers:

> Federal courts must exercise power "only in the last resort and as a necessity and *only when adjudication is consistent with a system of separated powers* and [the dispute is one] traditionally thought to be capable of resolution through the judicial process."

*Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984).[2]

■ The defendants argue that an Executive Order of President Carter, No. 12146, requires TVA to submit its dispute with DOE to the Attorney General. That Executive Order, found at 3 C.F.R. 409 (July 18, 1979), provides as follows:

1.4. Resolution of Inter-Agency Legal Disputes.

1.401. Whenever two or more executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular activity, each agency is encouraged to submit the dispute to the Attorney General.

1.402. Whenever two or more executive agencies whose heads serve at the pleasure of the President are unable to resolve such a legal dispute, the agencies *shall* submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere.

DOE contends that the dispute between TVA and DOE concerns the meaning of the Paducah and Oak Ridge agreements and that the agency heads both serve "at the pleasure of the President." Thus, DOE contends that this dispute should have been submitted to the Attorney General in deference to the Executive Branch.

The Court is of the opinion that Executive Order No. 12146 is not applicable to TVA. The above quoted provisions are extracted from the more lengthy text of Executive Order No. 12146, which is titled "Management of Federal Legal Resources." In other sections of Order 12146, a Federal Legal Council is established with an initial membership of representatives of 15 named federal agencies. TVA was not one of the 15 initial members, *see* E.O. 12146, §§ 1–101, 1–102, nor is it claimed by DOE that TVA has ever been a member. The function of the Council was essentially to promote efficiency in the use

---

1. From its inception, TVA has enjoyed an independence possessed by perhaps no other federal agency. The original House Committee stated upon TVA's inception: "We intend that [TVA] shall have much of the essential freedom and elasticity of a private business corporation." *McCarthy, Keeping TVA Unshackled—A Continuing Struggle,* 49 Tenn.L.Rev. 699, 700 (Summer 1982) (citing H.R.Rep. No. 130, 73d Cong., 1st Sess. 19 (1933)). TVA's independence is underscored by its corporate form, its maintenance of a separate legal staff, *see Algernon Blair Industrial Contractors, Inc. v. TVA,* 540 F.Supp. 551 (M.D.Ala.1982), its removal from centralized

control in Washington, its discretionary rate-making authority, *see Mobil Oil Corp. v. TVA,* 387 F.Supp. 498, 509 n. 28 (N.D.Ala.1974), and its exemption from at least 16 provisions of the Administrative Procedures Act, 49 Tenn.L.Rev. at 701, n. 6.

2. If this were merely a question of "standing", that specialized aspect of justiciability, a separation of powers analysis might not be necessary. *See Flast v. Cohen,* 392 U.S. 83, 100–01, 88 S.Ct. 1942, 1952–53, 20 L.Ed.2d 947 (1968).

of federal legal resources. *See* E.O. 12146, §§ 1–201, 1–5, 1–6. It appears obvious that the purpose of the Executive Order is to coordinate the legal resources of the numerous federal agencies represented in litigation by the Justice Department. TVA is not such an agency.

TVA argues that it has been afforded the independence and authority to control its own litigation activities. The TVA Act of 1933 provides that:

> ... the Corporation is authorized to make such expenditures and to enter into such contracts, agreements, and arrangements, upon such terms and conditions and in such manner as it may deem necessary, including the final settlement of all claims and litigation by or against the Corporation.

16 U.S.C. § 831h(b). TVA has for over 50 years actually maintained control over its litigation and has in fact judicially defeated an attempt by the Attorney General to assume such control. *See Algernon Blair, etc., v. TVA*, 540 F.Supp. 551 (M.D.Ala. 1982). This Court is in agreement with the *Algernon* court that, in spite of the somewhat ambiguous language of the Act, after over 50 years of TVA control of its own litigation, the TVA Act does confer such authority. *Id.* at 553. Given the purposes of Executive Order 12146, I conclude that it has no applicability to TVA. Accordingly, this Court does not reach the question of whether TVA's head "serves at the pleasure of the President."

Since I do not believe that Executive Order 12146 applies to TVA, I do not believe that resolution of this dispute between TVA and DOE represents an unwarranted interference into the Executive Branch by the Judiciary. As the claim raised by TVA presents a dispute of a type "traditionally thought to be capable of resolution through the judicial process" and adjudication of the claim is "consistent with a system of separated powers," *see Allen v. Wright*, 468 U.S. at 737, 104 S.Ct. at 3315, the Court concludes that the claim presented by TVA is justiciable.

### III. *Standing of the Other Plaintiffs and Intervenors.*

DOE contends that the plaintiffs in Civil Action No. 3–87–439 and those who intervened or moved to intervene in Civil Action No. 3–87–436 should be dismissed for lack of standing. These plaintiffs and intervenors argue that both they and their customers will suffer if DOE is able to avoid its contractual obligations since TVA will simply shift that shortfall on to them. Indeed, if this is correct, all ratepayers served by the TVA system will be so affected. This 6% rate increase, which TVA contends will be necessary, has not yet taken place.

The Court notes initially that these distributors and users of electric power do not claim to be parties to the contracts between TVA and DOE, nor do they claim to be third party beneficiaries of those contracts. Rather, they allege that they are entitled to injunctive and declaratory relief in that defendants' conduct violates 42 U.S.C. § 2204 (granting DOE the authority to enter into the power contracts with TVA) and that defendants' conduct is an attempt to manipulate TVA rates, contrary to the provisions of the TVA Act, 16 U.S.C. § 831, *et seq.*, which vests exclusive ratemaking authority in the TVA Board of Directors. They also contend that defendants' conduct violates three provisions of the United States Constitution. Plaintiffs seek judicial review of the actions of defendants under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (hereinafter "APA").

The plaintiffs, of course, must have sufficient standing to bring an action under Section 10 of the APA. The United States Court of Appeals for the Sixth Circuit has recognized,

> [s]tanding is conferred by Section 10 only when a relevant statute indicates congressional intent that the person or firm seeking review comes within the zone of interests sought to be regulated or protected.

*Cincinnati Electronics Corp. v. Kleppe*, 509 F.2d 1080, 1086 (6th Cir.1975). The issue of standing to bring an action under Section 10 of the APA turns ultimately on

"whether Congress intended for that class to be relied upon to challenge agency disregard of the law." *Block v. Community Nutrition Institute,* 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1983).

Upon review of the statutes raised by the plaintiffs in Civil Action No. 3–87–439 and the intervenors in Civil Action No. 3–87–436, I cannot find that Congress intended to confer standing upon either TVA customers or distributors. 42 U.S.C. § 2204 does nothing more than authorize DOE to contract for electric utility service. It cannot be said to create a "zone of interest" for other customers or distributors of TVA electric power.

The plaintiffs in Civil Action No. 3–87–436 refer generally to the TVA Act, 16 U.S.C. § 831, *et seq.,* concluding that the Act confers exclusive ratemaking powers on the TVA Board of Directors and that defendants' actions interfere with that ratemaking authority. Defendants insist that they do not challenge TVA's ratemaking authority, but in oral argument contended that TVA has overcharged DOE under the contracts. Nothing in the TVA Act nor its legislative history warrants an inference that Congress intended citizen suits as a tool for enforcing TVA's ratemaking authority.

There is no question that the dispute between TVA and DOE has an impact on the plaintiffs in Civil Action No. 3–87–436 and intervenors, as well as everyone in the geographic area served by TVA. The issue is not, however, whose interests are effected. Rather, the issue is who did Congress intend to challenge agency action. *Block,* 467 U.S. 347, 104 S.Ct. at 2454. Assuming, *arguendo,* defendants' actions do constitute a challenge to TVA's ratemaking powers, I believe that it is TVA that Congress intended to be the entity which would ensure that TVA's objectives were realized.

I do not believe that denial of standing to these parties and movants will threaten the objectives of the TVA Act. TVA has the same objective as do its customers in ensuring that its contracts are honored and its ratemaking power upheld. In fact, consumer suits over the rates TVA charges its customers could upset the statutory scheme of ensuring TVA discretion in ratesetting. *See id.,* at 352, 104 S.Ct. at 2457. The Court concludes that plaintiffs in Civil Action No. 3–87–439 and the intervenors are not in a "zone of interest" created by the TVA Act such that they should be allowed to participate as parties in this contract dispute between DOE and TVA.

Plaintiffs also contend that defendants' conduct violates the following provisions of the United States Constitution:

(1) Article IV, Section 3, Clause 2, giving Congress the exclusive power to govern the disposal and management of the property of the United States;

(2) Amendment 5 due process and just compensation clauses; and

(3) Article I, Section 8, prohibiting the imposition of taxes that are not uniform throughout the United States.

The plaintiffs contend that they fall within the "zones of interest" created by these constitutional provisions and therefore have standing to bring these actions. The Court disagrees.

Defendants' actions, even if in breach of the DOE–TVA contracts, do not constitute a taking of plaintiffs' property. The fact that plaintiffs' interests may be affected by DOE's performance under the contracts standing alone is not enough to create a property interest in the plaintiffs. In addition, it stretches logic even more to assert that defendants' conduct constitutes a prohibited "tax". Under the circumstances of this case, I cannot find that any of the cited constitutional provisions creates a "zone of interest" which would give any of these plaintiffs standing to bring an action against DOE.

Understandably, there are many people in the Tennessee Valley area with great interest in this lawsuit. However, it is in essence a contract dispute between TVA and DOE and must be resolved as such. Accordingly, Civil Action No. 4–87–439 will be dismissed, defendants' motion to dismiss will be granted with respect to intervenor TVIC, and Alcoa's motion to intervene in Civil Action No. 3–87–436 will be dismissed.

## IV. *Subject Matter Jurisdiction.*

■ Alternatively, the defendants contend that if TVA's claim is justiciable, it is in essence a breach of contract action against the United States. The Court agrees.

The Tucker Act vests exclusive jurisdiction over money claims against the United States greater than $10,000.00 in the United States Claims Court. 28 U.S.C. §§ 1346, 1491; *Matthews v. United States,* 810 F.2d 109, 111 (6th Cir.1987). Moreover, "a claimant may not avoid the exclusive jurisdiction of the Court of Claims merely by framing a complaint to seek non-monetary relief when the result would be the equivalent of obtaining monetary damages." *Id.,* at 113; *State of Tennessee ex rel. Leech v. Dole,* 749 F.2d 331, 336 (6th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985).

TVA makes two arguments with respect to the jurisdiction of the Claims Court. First, TVA contends that the Tucker Act was in fact a waiver of the government's sovereign immunity and that where one federal agency sues another, sovereign immunity is not applicable. It may be that sovereign immunity does not immunize one federal agency from suit by another agency. However, sovereign immunity is not the issue.

This Court must rely on Congress to define the parameters of its subject matter jurisdiction. The clear statutory language provides that the Claims Court has exclusive jurisdiction over claims for money damages "against the United States ... upon any express or implied contract." 28 U.S.C. § 1491(a)(1). No exceptions are drawn—the statutory language could not be clearer. Nor is there anything in the legislative history to indicate that an exception was intended where one government agency sues another. If this is a breach of contract action for money damages, exclusive jurisdiction over it rests in the Claims Court.

TVA's second contention is that this is not a breach of contract action for money damages. TVA characterizes its action as one for declaratory and injunctive relief.

It alleges that the defendants are proceeding with an arbitrary, capricious, bad faith, *ultra vires,* and unlawful course of conduct in refusing to pay the rates established by TVA's Board of Directors pursuant to the TVA Act and in refusing to comply with the terms of contracts entered into pursuant to 42 U.S.C. § 2204. Plaintiffs also characterize their claim as a constitutional due process claim. Finally, TVA seeks a writ of mandamus pursuant to 28 U.S.C. § 1361 requiring defendants Longenecker and Herrington to take steps to assure that the amounts allegedly owed are paid.

Federal courts have repeatedly rejected attempts by claimants to cast a contract dispute in different terms, such as actions for declaratory or injunctive relief, so as to subject it to the jurisdiction of the district court. *See, e.g., American Science & Engineering, Inc. v. Califano,* 571 F.2d 58 (1st Cir.1978); *Alabama Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221 (5th Cir.1976); *International Engineering Co., Division of A–T–O, Inc. v. Richardson,* 512 F.2d 573 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976). Attempts to characterize breach of contract claims as constitutional claims likewise fail. *See, e.g., J.C. Products, Inc. v. United States,* 608 F.Supp. 92 (W.D.Mich.1984).

In the *Naylor* case, *supra,* the Secretary of the FmHA entered into a contract with the plaintiff whereby plaintiff was to provide "backup insurance" to loan applicants. The FmHA cancelled the contract on the grounds that plaintiff lacked authority to enter into it and plaintiff sued in district court for injunctive and declaratory relief on the grounds that the agency action had been "*ultra vires*" of its authority. The Fifth Circuit observed that, "Irrespective of the terminology employed ... the object of the instant suit is clearly to compel appellants [the agency] in their official capacity to specifically perform a contract," *Naylor,* 530 F.2d at 1225–26, and ordered the action dismissed for lack of jurisdiction.

DOE's obligation in the instant action arises directly from the terms of the power contracts. The practical effect of granting

TVA the declaratory and injunctive relief it seeks would be to require DOE to perform under the contracts. Should TVA prevail in this action, the relief obtained will be in the form of money paid out of the United States Treasury under the terms of the contract. *See Matthews,* 810 F.2d at 113. In spite of TVA's characterization of this action, it is quite simply a breach of contract action brought against the United States. *See J.C. Products,* 608 F.Supp. at 94. Jurisdiction over such a claim lies exclusively in the Claims Court.

Moreover, if plaintiffs were permitted to avoid the exclusive jurisdiction of the Claims Court by drafting their complaints to seek only declaratory or injunctive relief, to make constitutional claims, or to allege arbitrary and capricious or *ultra vires* actions, such a practice would effectively destroy the exclusive jurisdiction of the Claims Court in breach of contract cases against the Government:

> It is difficult to imagine a situation where a party whose contract with a government agency has allegedly been breached, could not assert that the breach constituted arbitrary and capricious agency action and deprivation of property without due process of law.

*J.C. Products,* 608 F.Supp. at 95.

■ TVA's attempt to obtain mandamus relief in this court must also fail. To obtain mandamus relief a plaintiff must show that: (1) a public official has a plain duty to perform certain acts; (2) the plaintiff has a plain right to have those rights performed; and (3) there exists no other adequate remedy by which plaintiffs' rights can be vindicated. *Id.* Neither TVA's ratemaking authority, nor DOE's authority to enter into contracts with TVA, 42 U.S.C. § 2204, places a plain duty on either of the individual defendants to perform specific acts. Moreover, there exists an adequate remedy by which TVA's rights can be vindicated in the Claims Court. Accordingly, mandamus relief is not appropriate.

### V. *Transfer to the Claims Court.*

28 U.S.C. § 1406(c) permits, *inter alia,* transfer of appropriate cases to the Claims Court in the interest of justice.

Civil Action No. 3–87–436 could have been brought in the United States Claims Court originally. I find that "it is in the interest of justice" to transfer the case to the Claims Court and respectfully request of that court that the plaintiffs' substantive breach of contract claim be heard as expeditiously as possible.

Order accordingly.

### ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED as follows:

(1) The motion to dismiss of defendants in Civil Action No. 3–87–439 [Court File # 17] is GRANTED, and Civil Action No. 3–87–439 is DISMISSED.

(2) The motion to intervene of the Aluminum Company of America in Civil Action No. 3–87–436 [Court File # 44] is DENIED.

(3) The motion to dismiss of defendants in Civil Action No. 3–87–436 [Court File # 23] is GRANTED IN PART and DENIED IN PART. With respect to intervenor Tennessee Valley Industrial Corporation, defendants' motion to dismiss is GRANTED, and TVIC is DISMISSED. In all other respects, defendants' motion is DENIED, and Civil Action No. 3–87–436 is TRANSFERRED to the United States Claims Court.