INTER TRIBAL COUNCIL OF ARIZONA, INC., an Arizona non-profit corporation, individually and as Trustee of the Arizona Inter Tribal Trust Fund; the Havasupai Indian Tribe, a Federally recognized Indian Tribe; San Carlos Apache Tribe, a Federally recognized Indian Tribe; the Tonto Apache Tribe, a Federally recognized Indian Reservation; the Hualapai Indian Tribe, a Federally recognized Indian Tribe; Cocopah Indian Tribe, a Federally recognized Indian Tribe; the Fort Mohave Indian Tribe, a Federally recognized Indian Tribe; the Kaibab Paiute Indian Tribe, a Federally recognized Indian Tribe, Plaintiffs–Appellants,

v.

Bruce BABBITT, in his official capacity as Secretary of the Interior of the United States; Barron Collier Company; City of Phoenix, Arizona; J. Fife Symington, III, in his official capacity as Governor of the State of Arizona; Jesse Brown, Secretary, in his official capacity as Acting Secretary of Veterans' Affairs, Defendants–Appellees.

No. 93–16564.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 16, 1995.

Decided March 28, 1995.

Joe P. Sparks, Kevin T. Tehan and John H. Ryley, Sparks & Siler, Scottsdale, AZ, for plaintiffs-appellants.

Martin W. Matzen, Edward J. Passarelli, and Andrew C. Mergen, Attys., U.S. Dept. of Justice, Washington, DC, for defendant-appellee.

Donald M. Peters, and Susan A. Cannata, Mayer, Hendricks, Victor, Osborn & Maledon, Phoenix, AZ, for defendant-appellee.

Before: HUG, FARRIS and POOLE, Circuit Judges.

POOLE, Circuit Judge:

The Inter Tribal Council of Arizona ("ITCA"), a consortium of 19 federally recognized Indian Tribes in Arizona, along with six of the tribes in their individual capacities (collectively, the "Tribes"), sued the Secretary of the Interior ("Secretary") and Barron Collier, Inc., Collier Development Corporation and Collier Enterprises (collectively, "Collier") to challenge aspects of the Secretary's exchange of the federally owned Phoenix Indian High School property for lands in the Florida Everglades privately owned by Collier plus $34.9 million cash to be placed in trust for the Tribes pursuant to the Arizona–Florida Land Exchange Act. Specifically, the Tribes contend that the Secretary's actions in accepting a four year delay in the close of escrow on the funds to be placed in trust for the Tribes, in accepting inadequate collateral and a non-recourse obligation, in allowing Barron Collier Company alone to sign the trust agreement meant to bind all three Collier corporations, and in offering less favorable terms to other potential buyers are judicially reviewable actions that constitute an abuse of discretion. The district court dismissed the claims of the Tribes, who now appeal. This court has jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm on the grounds that the actions of the Secretary are precluded from judicial review because they are committed to agency discretion by law.

I

The Phoenix Indian High School, an off-reservation boarding school for Indian students set on 111 acres of land (the "School

Property"), was established in 1891 through a combination of Congressional funds and private donations by residents of Phoenix. The School was operated by the Bureau of Indian Affairs ("BIA") until it was closed by the Secretary in 1990. The School served an important educational and social role for the Tribes.

In 1987, a Congressional oversight report found that the physical facilities of the Phoenix Indian High School had deteriorated significantly, while enrollment had declined by approximately 40% since the 1960's. Rather than spend significant amounts of money to repair the physical plant, the Department of the Interior ("DOI") elected to close this off-reservation boarding school and relocate the Indian students to high schools in their communities, some of which had been recently renovated.

On May 11, 1988, the Secretary (then Manuel Lujan) and Collier executed a contract (the "Exchange Agreement") that contained an irrevocable offer from the United States to Collier to exchange the School Property, less 20 acres to be conveyed by the United States to the City of Phoenix for the building of a public park, 4.5 acres to be conveyed by the United States to the State of Arizona for the construction and operation of a home for veterans, and 11.5 acres to be transferred administratively by the Secretary to the Veterans Administration for use in its programs, for land in the Florida Everglades privately owned by Collier plus $34.9 million in cash.

On November 18, 1988, Congress ratified and confirmed the Exchange Agreement by passing the Arizona–Florida Land Exchange Act ("AFLE"), Public Law 100–696, 102 Stat. 4577 (November 18, 1988).

The AFLE added three major features to the Agreement. First, § 405(a) established two trust funds, the Arizona Inter Tribal Trust Fund and the Navajo Trust Fund, and provided that all monetary proceeds from the sale were to be deposited into the two funds to supplement tribal education after the Phoenix Indian High School was closed. Next, § 403 allowed the Secretary, after consulting with the Inter Tribal Council of Arizona and the governing body of the Navajo

tribe, to elect to receive the monetary proceeds for deposit into the trust funds either in one lump sum payment, or in 30 annual interest payments with the entire principal amount to be paid at the time of the last annual payment. Third, once Collier indicated its intent to accept the offer, §§ 402(h)(2)–(9) directed the Secretary to solicit bids from other purchasers to buy the School Property, less the parcels allocated elsewhere, for more than the total of $34.9 million plus the value of Collier's land. If such a bid was accepted, the proceeds from the sale would be used to purchase Collier's land and all excess proceeds would be added to the Indian trust funds. Collier, however, was given the opportunity to make a final counter offer in response to any bids received.[1]

The Secretary, in consultation with the Tribes, elected to receive the sale proceeds in the form of a 30–year annuity. The Secretary and Collier reached an impasse in their negotiations regarding the collateralization of the annuity. After much negotiation, Collier indicated that it would provide the requested collateral only if it was given flexibility on the payment schedule. Secretary Lujan agreed, and on August 10, 1992, the Secretary and Barron Collier Company (acting on behalf of Collier Enterprises and Collier Development Corporation), pursuant to Paragraph 25(a) of the Exchange Agreement, entered into an Agreement to Extend the Deadline for Closing on the Exchange of Lands ("Extension Agreement"). The Extension Agreement extended the closing date for the land exchange to October 9, 1992, to allow the parties to negotiate in good faith a Trust Fund Payment Agreement ("TFPA") for the $34.9 million to be paid at the end of 30 years, with $2,966,500 per year to be paid as annual interest commencing one year after the date of the closing. Pursuant to the Extension Agreement, the trust fund payment obligations were to be without personal recourse against Collier, but were to be secured by an annuity (not yet arranged) that would provide $34.9 million at the end of 30 years, and first liens on Collier's interest in the land transferred to Collier pursuant to the land exchange. The Extension Agreement also provided that closing would occur not later than four years from the date on which the

---

1. No additional bids were received.

TFPA was executed by the parties. If Collier failed to close within four years, the United States would have the absolute right to seek, among other remedies, specific performance of the land exchange and the TFPA.

## II

On October 8, 1992, the Tribes sued the Secretary and Collier seeking a declaratory judgment, permanent injunctive relief and a writ of mandamus in response to claimed violations of the AFLE. In addition, the Tribes sought a preliminary injunction to enjoin the Secretary from executing a TFPA in violation of the AFLE and his fiduciary duty to the Tribes.

On October 23, 1992, the district court denied the Tribes' request for a preliminary injunction, ruling, among other things, that § 402(h) of the AFLE precluded judicial review of any secretarial action. On December 18, 1992 the United States and Barron Collier Company (acting on behalf of Collier Enterprises and Collier Development Corporation) executed the TFPA.

On December 9 and 10, 1992, the Secretary and Collier, respectively, filed motions to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. On June 21, 1993, the district court granted defendants' motions.

## III

■ We review the decision of the district court de novo. *See Everest & Jennings v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994) (dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is a question of law reviewed de novo); *Nike, Inc. v. Comercial Iberica De Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir.1994) (existence of subject matter jurisdiction is a question of law reviewed de novo).

## IV

■ The Tribes argue that as beneficiaries of the AFLE, they can obtain judicial review of the Secretary's actions taken pursuant to the AFLE under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706. The APA does not provide judicial review of a statute, however, where that statute precludes judicial review. 5 U.S.C. § 701(a)(1). "Whether and to what extent a statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute*, 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984) (citations omitted) (consumers barred, but producer not barred, from challenging actions of Secretary of Agriculture in regulating milk prices pursuant to federal agricultural law where Secretary's actions made reconstituted milk uneconomical for handlers to process).

■ The Tribes are not entitled to judicial review of the Secretary's actions under the APA. The express language of the AFLE clearly establishes Congressional intent to preclude judicial review of any action taken by the Secretary pursuant to subsection 402(h). AFLE § 402(h)(9) provides:

No action of the Secretary under this subsection shall be subject to the provisions of 5 U.S.C. § 553 through 558 or 701 through 706.

All actions challenged by the Tribes fall under § 402(h). The Tribes claim that the Secretary erred by accepting a four-year delay in closing and by allowing Barron Collier Company to sign the Extension Agreement on behalf of all Collier entities. Sections 402(h)(1) and 402(h)(7) govern these claims. These sections provide that Collier may accept the offer of the United States under the terms of the Exchange Agreement. Paragraph 25(a) of the Exchange Agreement permits extensions of the closing date. It provides that the closing date:

cannot ... be earlier than 90 days or later than six months from the date of acceptance by Collier of the offer of the United States ... unless the parties mutually agree in writing to an earlier or later closing date.

Moreover, Paragraph 32 of the Exchange Agreement precludes non-parties from obtaining judicial review of actions taken pursuant to the Agreement, stating that:

[n]othing in this Agreement shall be construed as creating any rights of enforce-

ment by any person or entity that is not a party to this Agreement.

Thus, the challenged actions taken by the Secretary in signing the Extension Agreement with Collier are committed to his discretion and are not subject to judicial review.

The Tribes also claim that the Secretary erred by offering different terms to other potential purchasers and by accepting inadequate collateral. Sections 402(h)(2)–(9) govern the terms offered by the Secretary to other potential purchasers. Sections 402(3)(D) and 402(7) govern the collateral requirement for any purchaser accepting the 30–year payment plan.

The structure, legislative history and objectives of the AFLE support the conclusion that the actions challenged by the Tribes are shielded from judicial review. The House Report and Congressional debate on the proposed AFLE reveals that Congress did not design the AFLE to benefit only the Tribes. Congress intended the AFLE to serve several purposes simultaneously: to dispose of the School Property, to finance tribal education, to preserve the Florida ecosystem, to create a park in Phoenix, and to expand the Phoenix VA hospital. Congress probably did not desire to create potential challenges to the AFLE that would disrupt the "complex and delicate administrative scheme" it had created. *Id.* at 348, 104 S.Ct. at 2455.

### V

The Tribes also contend that apart from the APA, the Secretary owed the Tribes a fiduciary duty that provides a separate basis for judicial review.

The federal government owes a fiduciary obligation to all Indian tribes as a class. *Lincoln v. Vigil,* —— U.S. ——, ——, 113 S.Ct. 2024, 2033, 124 L.Ed.2d 101, 114 (1993). The federal government also incurs specific fiduciary duties toward particular Indian tribes when it manages or operates Indian lands or resources. *U.S. v. Mitchell,* 463 U.S. 206, 226, 103 S.Ct. 2961, 2972–73, 77 L.Ed.2d 580 (1983). The elements of this type of common law trust are a trustee (the United States), a beneficiary (the Indian allottees) and a trust corpus (the regulated Indian property, lands or funds). *Id.* at 225, 103 S.Ct. at 2972.

There is no common law trust in this case because the school property is not properly the subject of a trust corpus. The off-reservation school was not part of Indian lands, but was merely allocated by the BIA for use by the Tribes. Although the Tribes benefitted greatly from the Phoenix Indian High School, the Tribes have no interest in the School Property, which was owned and controlled by the United States government. The Tribes' only interest is in the proceeds of the Inter Tribal Trust Fund and the Navajo Trust Fund. Both of these trust funds were created by the AFLE. Thus, the government owes no fiduciary duty to the Tribes apart from its obligations under the AFLE, which precludes judicial review of the actions challenged by the Tribes.

**AFFIRMED.**