ROSS INCINERATION SERVICES, INC., Plaintiff,

v.

Carol M. BROWNER, in her Official Capacity as Administrator of the United States Environmental Protection Agency, et al., Defendants.

No. 1:99CV2841.

United States District Court, N.D. Ohio, Eastern Division.

Sept. 22, 2000.

---

Richard D. Panza, Matthew W. Nakon, Rachelle K. Zidar, Wickens, Herzer & Panza, Lorain, OH, for Ross Incineration Services, Inc., plaintiff.

Andrew J. Doyle, Department Of Justice, Environment & Natural Resources Division, Washington, DC, for Carol M. Browner, Francis X. Lyons, Regional Administrator of the United States Environmental Protection Agency, defendants.

Steven J. Paffilas, Office Of The U.S. Attorney, Cleveland, OH, Andrew J. Doyle, Mary E. Gleaves, Mary Andrews, The U.S. Environmental Protection Agency, Washington, DC, Richard R. Wagner, Chicago, IL, for Environmental Protection Agency, defendants.

## MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiff Ross Incineration Services, Inc. ("Ross") brings this action against the Environmental Protection Agency ("EPA"), EPA administrator Carol Browner, and EPA regional administrator Francis Lyons.[1] Ross alleges that it owns and operates a waste treatment and storage facility in Grafton, Ohio, where it incinerates, among other things, aerosol cans and their contents. Ross alleges that, since 1994, it has processed over 1 million pounds of aerosol can waste. On April 11, 1999, an employee was injured while inspecting a "discharge tube," part of the "feed mechanism" used to convey aerosol cans to the incineration chamber. Ross subsequently submitted to the EPA an accident investigation report which, among other things, outlined improvements Ross intended to make to prevent the possibility of any recurrence of this type of accident.

The EPA, however, responded by issuing an Administrative Order, pursuant to § 7003 of the Resource Conservation and Recovery Act ("RCRA"), codified at 42 U.S.C. § 6973. This " § 7003 Order" stated that Ross's outlined improvements were

1. The Court refers to all defendants collectively as "EPA."

inadequate and prohibited Ross from continuing to operate its aerosol feed mechanisms. Ross strongly disagreed with the conclusions and mandate contained in the EPA's § 7003 Order, so it filed this action. In its complaint, Ross prays for: (1) de novo review of the EPA's § 7003 Order; (2) a judicial determination that the § 7003 Order is arbitrary and capricious; (3) a judicial determination that § 7003 of RCRA is unconstitutional, as applied in this case; (4) a corresponding declaratory judgment; and (5) injunctive relief prohibiting the EPA from enforcing the § 7003 Order. With its complaint, Ross also filed a motion for preliminary injunctive relief (docket no. 7).

The EPA responded with a motion to dismiss for lack of subject matter jurisdiction (docket no. 14). In addition, the EPA moves to strike the affidavit of Brian Baxter (docket no. 21), which Ross filed in support of its motion for preliminary injunction. For the reasons stated below, the motion to dismiss is **GRANTED,** and the other motions are both **DENIED as moot.**

## I.

The undisputed factual and procedural background of this case is as follows. Ross operates a hazardous waste treatment plant in Grafton, Ohio. Ross operates this facility pursuant to a RCRA waste disposal permit issued by the EPA in 1988. One of the methods of waste treatment Ross uses at its Grafton plant is incineration; one of the hazardous materials Ross incinerates is aerosol cans and their contents.

The mechanics of Ross's incineration of aerosol cans begins with an "aerosol feeder mechanism," of which Ross has three. These feeders cut open the aerosol cans and inject the cans and their pressurized contents through a "discharge tube" into an incinerator. The incinerator includes both a "rotary kiln," which is fed by one aerosol feeder, and a "main chamber," which is fed by the other two aerosol feeders. On April 11, 1999, a Ross employee was inspecting one of the two discharge tubes that feed the main chamber, because the tube was plugged. During his inspection, some aerosol cans in the incinerator ignited, and flames shot from the main chamber back up the discharge tube, burning the employee's face and wrists.

Ross responded to this incident by: (1) voluntarily discontinuing the operation of all three aerosol feeders; (2) investigating the incident and, on May 3, 1999, submitting to the EPA a report; and (3) modifying its equipment and procedures to avoid any reoccurrence of this type of accident. The modifications, which Ross explained in its EPA report, included: (1) installing valves to prevent oxygen from entering the discharge tubes during unplugging; (2) locking the discharge tube "clean-out port," thereby ensuring that any employee who wanted to inspect a plugged tube would have to get a key from a supervisor, who would oversee the process; and (3) increasing the amount of nitrogen pumped into the discharge tubes during unplugging, to maintain an inert atmosphere.

Despite Ross's having undertaken these modifications, the EPA responded by sending Ross an administrative order, dated May 14, 1999, commanding Ross to continue its non-operation of the three aerosol feeders. This " § 7003 Order," which the EPA issued pursuant to RCRA § 7003, noted that "[a]ccidents relating to unplugging the aerosol can feed mechanism have occurred on prior occasions at [Ross's] facility but no one had been reported injured." The § 7003 Order stated that, although Ross had "provided a brief report of the [most recent] accident to EPA, identifying the causes and proposing a solution of how it intends to prevent this accident from reoccurring," the EPA "determined that [this solution] is inadequate to prevent further accidents." Ultimately, the EPA concluded that Ross's "past and present handling, storage and treatment of hazardous waste may present an imminent and substantial endangerment to health or

the environment," and ordered that Ross "shall not operate the aerosol can feed mechanisms on the main chamber and kiln until such time as [Ross] demonstrates, to the satisfaction of EPA, that the aerosol can feed mechanisms to the main chamber and kiln can be used without presenting an imminent and substantial endangerment to human health or the environment." The § 7003 Order, however, was somewhat conclusory: it did not explain the precise scientific or factual *basis* for the EPA's conclusion that Ross's aerosol feeders remained unsafe despite Ross's modifications, nor did it explain what additional modifications Ross needed to undertake to resume use of its aerosol feeders.

Finally, the § 7003 Order stated that: (1) Ross could confer with two EPA employees, David Mucha and Bryan Holtrop, to discuss the terms of the § 7003 Order; (2) the § 7003 Order expired only after Ross received notice from EPA that it could resume operation of the aerosol feeders; and (3) Ross would be subject to a fine of $5,000 per day for failure to comply with the § 7003 Order.

Ross responded to the EPA on May 18, 1999, stating it would comply with the § 7003 Order's mandate to continue non-operation of the aerosol feeders, but objecting that the EPA had "acted without cause." Ross asked the EPA to send "all [the] evidence supporting" the § 7003 Order, asserting that the EPA had "never voluntarily submitted any information upon which it could base its conclusions that the design of the aerosol can feed mechanism is inadequate or that the recommendations proposed in [Ross's investigation report], after the latest incident, are inappropriate." Ross added it believed the EPA "has now adopted a policy of issuing these orders, as a matter of form, in response to any operational activity experienced at the facility, regardless of cau-

sation," and that the § 7003 Order "constitute[d] an abuse of discretion." [2]

The EPA did not immediately respond to Ross's letter. Over the course of the next four months, Ross continued to ask the EPA to define precisely why its remedial actions were insufficient and what additional actions the EPA required. On June 14, 1999, Ross executives flew to Chicago to meet with EPA enforcement officer Holtrop. Ross asserts that, at this meeting, Holtrop "provided [it] with no substantive input ... as to why the § 7003 Order was issued, on what evidence it was based, or how it may be lifted." On June 28–30, 1999, EPA representatives visited and inspected Ross's facility, but did not thereafter give Ross any direction. On July 29, 1999, after not hearing from the EPA for a month, Ross finally wrote EPA again, asserting that the EPA's inspection had shown the three aerosol feeders were safe and "request[ing] written permission *to commence operation*" of its aerosol feeders. Ross stated that "if such approval is not forthcoming, within the next three weeks, Ross believes it is justified to begin operation of the system thereafter." Ross concluded:

> Understanding that, pursuant to Section 7003, the U.S. EPA has the right to attempt to restrain such operation, Ross is more than willing to delay such operation until the rights of all parties can be judicially reviewed. That, of course, is conditioned upon the U.S. EPA notifying Ross of its intention to seek judicial restraint within the next three weeks and commencing a judicial proceeding in Federal District Court within a reasonable time period thereafter.

In essence, then, Ross asked the EPA to act within three weeks and either: (1) allow it to resume using its aerosol feeders, or (2) file a lawsuit.

**2.** The basis for Ross's assertion that the EPA had a policy of automatically issuing § 7003 Orders was that the EPA had issued a § 7003 Order to Ross in 1998, after an explosion had occurred at its "side door feed location," and

"42 of the 50 paragraphs in the [1999 Order] also appear on the [1998 Order]." Ross felt this showed that "each new event at Ross, regardless of cause or magnitude, reflexively initiates the issuance of a [§ 7003 Order]."

Via telephone calls, the EPA promised a response but kept asking for more time. Five weeks passed and, after the EPA missed its own promised deadline for the third time, Ross wrote the EPA, on September 2, 1999, "that it is Ross's position that it is no longer bound by its consent to obey the [§ 7003] Order. [Ross] reserves the right to operate the aerosol feed injector at any time, and hereby places the U.S. EPA on notice of such intent."

The EPA still did not respond, but Ross did not make good on its threat and begin to use its aerosol feeders. Finally, on September 16, 1999, the EPA responded to Ross's request for more explanation. The EPA acknowledged that Ross had "implemented a variety of corrective measures," including "the installation and operation of a nitrogen purge system, a de-jamming system, and a revision of the manual operating procedures associated with the aerosol can feed mechanisms." The EPA perceived, however, that "the implementation and effectiveness of these corrective measures rely to a large extent on the technical capability of the responsible employees to follow and perform specific manual procedures to compensate for hazards that are caused by the design of the unit and are outside the direct control of these same employees." The EPA concluded that Ross's corrective measures were, therefore, insufficient, because "the hazards associated with the aerosol can feed mechanisms are caused not only by the presence of oxygen in the unit but by the design of the unit itself."

The EPA then set out five specific modifications Ross had to undertake to make the aerosol feeders safe. Greatly simplified, these modifications were all intended to ensure that the incineration of the aerosol cans and their contents could occur only in the incinerator, and not the discharge tubes. The modifications included: (1) installation of a "dual door mechanical interlock configuration," to prevent radiant heat from the incinerator from reaching and igniting aerosol propellant in the discharge tubes; (2) modification of the "dual valve mechanism" located in the "vertical drop tube," so that the two valves were never open simultaneously; and (3) increasing the slope of the "horizontal discharge tube," to ensure that the contents of the aerosol cans (and any other hazardous waste) drained properly into the incinerator. Finally, the EPA stated it would not vacate the § 7003 Order, as Ross had requested, and it expected Ross to continue to refrain from operating the aerosol feeders. The EPA also noted that it might construe any non-compliance as a violation of Ross's RCRA waste disposal permit.

On November 19, 1999, two months after the EPA sent Ross its explanation of the remedial measures it believed were necessary, Ross took two actions. First, Ross sent a letter to the EPA hotly disputing the EPA's conclusions, going so far as to state that the EPA's comments "represent a premature conclusion in search of justification" and "do not reflect a rudimentary understanding of [Ross's] aerosol feeder process or the modifications made to address potential hazards." Ross insisted that EPA had "completely ignored" the fact that "the aerosol injector mechanisms have been operating for 16 years, with over 36,000 operating hours and 450,000 man hours in the past five years with only one lost-time accident." Ross then responded, point-by-point, to the EPA's conclusions about necessary corrective measures, disagreeing with each one.[3]

3. Three examples of Ross's disagreement: (1) "radiant heat from the incineration system does not have a significant impact upon the temperature inside the aerosol feeder," and thus "radiant heat does not pose a risk" of igniting aerosol propellant in the discharge tubes; (2) "the induced draft of the incinerator assures that" aerosol propellant is sucked into the incinerator and is not ignited in the "vertical drop tube;" and (3) "the horizontal [discharge] tube is sufficiently sloped toward the incinerator to allow for drainage of any accumulated material." Ross has since supplied the EPA with a detailed, verified expert opinion that Ross's aerosol feed mechanisms

The second action Ross took was to file this lawsuit. Ross asks the Court to rule that the § 7003 Order is arbitrary and capricious, and to enjoin the EPA from enforcing it. Essentially, Ross hopes to avoid any continued negotiation with the EPA and to resume operation of its aerosol feed mechanisms immediately.

The EPA moves to dismiss Ross's lawsuit for lack of jurisdiction, premised on three arguments: (1) RCRA precludes judicial review of § 7003 Orders, unless and until the EPA seeks enforcement of its Order; (2) the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, allows Ross to litigate only "final agency actions," and the § 7003 Order is not a "final agency action" of the EPA; and (3) Ross's claim is not ripe for judicial review. If the EPA is correct on any one of these contentions, then the EPA is also correct that this action must be dismissed.

## II.

There are two general categories into which Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction fall: facial attacks and factual attacks. Fed. R.Civ.P. 12(b)(1); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994), *cert. denied*, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994). A facial attack challenges the sufficiency of the pleading itself, much like a motion brought under Rule 12(b)(6). On such a motion, the Court must take all of the material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party. *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

█ In contrast, a factual attack, as is made here, challenges the factual existence of subject matter jurisdiction. On this form of motion, the Court's inquiry is limited to determining whether the challenged pleadings set forth allegations sufficient to show the Court that it has jurisdiction over the subject matter; "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (internal citations omitted); *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir.1996). In reviewing such a motion, a district court is to probe the facts and assess the validity of its own jurisdiction. In doing so, the Court has wide discretion to consider affidavits and documents outside the complaint, and may even conduct a limited evidentiary hearing if necessary. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990). In connection with this analysis, the plaintiff bears the burden of demonstrating that the Court has and may appropriately exercise jurisdiction over the subject matter. *RMI Titanium Co.*, 78 F.3d at 1134. The Court may examine evidence of its power to hear a case, and must make any factual findings to determine whether it has jurisdiction. *Kroll v. United States*, 58 F.3d 1087, 1090 (6th Cir.1995); *Rogers v. Stratton Inds., Inc.*, 798 F.2d 913, 915 (6th Cir.1986). The Court's examination of this evidence does not convert a 12(b)(1) motion into a Rule 56 motion. *Rogers*, 798 F.2d at 915.

## III.

Given that Ross is suing an agency of the United States, the Court's jurisdictional inquiry begins with the question of whether Ross can point to an applicable waiver of sovereign immunity. Ross points to the APA, which waives sovereign immunity and allows judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. This statute does not allow judicial review of "preliminary, procedural, or intermediate agency action[s] or ruling[s]." *Id.* This waiver of immunity does not apply, moreover, to the extent that the governing statute precludes judicial review. 5 U.S.C. § 701(a)(1); *Block v. Com-*

do not imminently or substantially endanger the public health or the environment.

*munity Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). Thus, jurisdiction can exist only in this case if *both* of the following are true: (1) the challenged § 7003 Order is a "final agency action;" *and* (2) RCRA, itself, does not preclude judicial review of § 7003 Orders.

■ The EPA argues that neither of these necessary conditions is met. The Court agrees with the EPA that RCRA *does* preclude judicial review of § 7003 Orders, unless and until the EPA seeks actual enforcement of its Order. Accordingly, the EPA's motion to dismiss for lack of jurisdiction must be granted on this ground.[4] The Court's analysis follows.

Ross begins its argument that RCRA does *not* preclude pre-enforcement judicial review of § 7003 Orders by citing case law holding that: (1) there is a "presumption in favor of judicial review of administrative action;" and (2) "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Block,* 467 U.S. at 348, 350, 104 S.Ct. 2450. Noting that RCRA is facially silent regarding whether § 7003 Orders are subject to judicial review, Ross asserts this Court should indulge the presumption in favor of review, even before the EPA takes action to enforce the § 7003 Order.

The Court rejects this argument because, as the Supreme Court has held, the overall structure of an Act may "demonstrate that Congress intended to preclude challenges" even though "the Act is facial-

ly silent with respect to pre-enforcement claims." *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 208, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994). Courts may infer congressional intent to preclude judicial review from the "collective import of legislative and judicial history behind a particular statute," and from "inferences drawn from the statutory scheme as a whole." *Block,* 467 U.S. at 349, 104 S.Ct. 2450.

In the case of RCRA, Congress gave the EPA a choice of how to respond to "evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6973(a) (codifying RCRA § 7003(a)). Congress provided that the EPA could: (1) bring a lawsuit against the offending party, and/or (2) issue an administrative order directing the offending party to "take such other action as may be necessary." Indeed, Congress *amended* RCRA in 1980 to add the latter option. That Congress gave the EPA (and not the solid waste handler) this choice strongly implies Congressional intent to preclude judicial review if the EPA does not seek it by filing a lawsuit. As another court explained, in an analogous situation:

> As the statutory language shows, Congress gave the EPA two options under this provision: first, issue a compliance order, or second, file a suit for enforcement. [The plaintiff's] position that it is entitled to judicial review of a compli-

4. For two reasons, the Court does not base the dismissal of this action on the ground that a § 7003 Order under RCRA is not a "final agency action." First given the Court's conclusion that RCRA does preclude judicial review of § 7003 Orders, it is unnecessary to reach the question of whether such Orders are "final agency actions." Second, the Court finds it difficult to reconcile two, somewhat conflicting decisions by the Sixth Circuit Court of Appeals regarding what constitutes a "final agency action" within the meaning of the APA. *See Allsteel, Inc. v. E.P.A.,* 25 F.3d 312, 315 (6th Cir.1994) (holding that jurisdic-

tion existed to review an EPA administrative order and staying that order), and *Southern Ohio Coal Co. v. Office of Surface Mining, Reclamation and Enforcement, Dept. of the Interior,* 20 F.3d 1418, 1425–28 (6th Cir. 1994), *cert. denied,* 513 U.S. 927, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994) (concluding that no jurisdiction existed to review an administrative order issued by the EPA because it was not a final agency action). The Court also does not reach the EPA's "ripeness" argument, finding that it is essentially indistinguishable from its "final agency action" argument.

ance order before any enforcement suit is brought would eliminate this choice.

*Hoffman Group, Inc. v. E.P.A.*, 902 F.2d 567, 569 (7th Cir.1990) (analyzing provisions contained in the Clean Water Act, 33 U.S.C. § 1319(a)(3)).[5]

This Court has previously concluded that, for essentially the same reason as stated in *Hoffman*, "RCRA precludes judicial review of pre-enforcement agency orders issued under § 3013 of that Act." *Armco, Inc. v. E.P.A.*, No. 1:98–CV–2499, slip op. at 2 (N.D.Ohio Mar. 30,1999). In *Armco*, this Court "relied heavily on the analysis set forth in *United States v. Mobil Oil Corp.*, No. 96–CV–1432(JG), 1997 WL 1048911 (E.D.N.Y. Sept.11, 1997)." *Armco*, slip op. at 2. The *Mobil Oil* court dismissed counterclaims asserting a pre-enforcement challenge to a § 3013 order because, *inter alia*, "pre-enforcement review of § 3013 orders would frustrate Congress' purpose of freeing the EPA from the burden of answering challenges at every phase of environmental clean-up, and is contrary to RCRA." *Mobil Oil*, 1997 WL 1048911 at *5. Ross argues that *Armco* and *Mobil Oil* are distinguishable from this case, for two primary reasons: (1) the statutory scheme authorizing the EPA to issue the § 3013 Order in those cases is substantially different from the statutory scheme authorizing the EPA to issue the § 7003 Order in this case; and (2) the EPA's actions in this case are so egregious that they have worked to deprive Ross of its constitutional right to due process. The Court disagrees with both contentions.

Regarding Ross's first contention, the differences between a § 3013 Order and a § 7003 Order do not support different treatment for purposes of judicial review. A § 3013 Order is a "study order," while a § 7003 Order is a "compliance order." A § 3013 Order directs the recipient to study its facility to determine whether it might be engaging in detrimental environmental activity. For example, the § 3013 Order in *Armco* directed the plaintiff "to propose and conduct certain hazardous waste monitoring, testing, analysis and reporting" at its manufacturing facility, *Armco*, slip op. at 1; the § 3013 Order in *Mobil Oil* directed the plaintiff to "study alleged contamination at [its] entire [petroleum distribution] facility." *Mobil Oil*, 1997 WL 1048911 at *2.

A § 7003 Order, on the other hand, does more than ask a waste handler merely to conduct a *study* looking for possible statutory violations; a § 7003 Order directs the entity to actually *remedy* perceived violations of RCRA, often requiring the entity to take or cease action (at relatively great expense) to achieve statutory compliance. For example, the § 7003 Order in this case requires Ross to completely cease the (presumably profitable) operation of its aerosol can feed mechanisms until it makes modifications "to EPA's satisfaction." Another difference is that, if a waste handler ignores a § 7003 Order, the EPA has two choices: disregard the entity's non-compliance, or bring suit to enforce compliance. If a waste handler ignores a § 3013 Order, the EPA has a third choice: conduct the study itself.[6]

5. The *Hoffman* court rejected the plaintiff's contention, similar to Ross's, that "it is entitled to judicial review of the EPA's December 1987 Compliance Order even though the agency has not decided whether to bring an enforcement action in court." *Hoffman*, 902 F.2d at 569. The court further noted that "appellate decisions under the Clean Air Act and the Comprehensive Environmental Response, Compensation, and Liability Act [also] hold that agency compliance orders such as involved here are unreviewable until enforcement proceedings are instituted." *Id.*

6. Ross suggests another distinction between § 7003 Orders and § 3013 Orders: the "evidentiary premise" for the EPA's issuance of a § 7003 Order is substantially higher, so that it requires more of an "emergency" for the EPA to issue a § 7003 Order than a § 3013 Order. Relying on this distinction, Ross tries to distinguish *Armco* by arguing that, because non-compliance with a § 7003 Order would create a more dire environmental emergency than non-compliance with a § 3013 Order, pre-enforcement judicial review of § 7003 Orders is appropriate—Ross should not have to

Ross is correct, then, that a § 7003 Order is potentially much more onerous to its recipient than a § 3013 Order. Indeed, Ross asserts that the § 7003 Order it received is so onerous that it is "confiscatory, in that Ross is being denied use of a substantial asset." Even if this assertion is true, however, the distinctions highlighted by Ross between these two types of agency orders do not support a different level of availability of judicial review. When it enacted RCRA, "Congress gave the EPA the discretion to decide which *study* orders to enforce, just as it gave it the discretion which *compliance* orders to enforce. In either instance, pre-enforcement review would usurp agency discretion contrary to congressional intent." *Mobil Oil,* 1997 WL 1048911 at *4 (emphasis added). Ross's "position that it is entitled to judicial review of a compliance order before any enforcement suit is brought would eliminate" Congress's scheme of giving the EPA some choice on how to proceed. *Hoffman,* 902 F.2d at 569. That this case involves a RCRA compliance order while *Armco* involved a RCRA study order does not serve to change the result.

With its second contention, Ross seeks to rely on this Court's statements in *Armco* suggesting that pre-enforcement review of administrative orders issued under RCRA, even though otherwise unavailable, may nonetheless become appropriate if due process concerns are implicated. Specifically, the Court stated that, if the RCRA "order itself is directly and irreversibly confiscatory, preventing any *meaningful* judicial review, and the agency acts in a manner which appears designed to thwart judicial review of its order, [then]

due process concerns could override an otherwise evident congressional intent to generally prohibit pre-enforcement judicial review." *Armco,* slip op. at 7 (emphasis in original) (citing *Allsteel,* 25 F.3d at 316 (Wellford, J., concurring)).

Ross argues that the extraordinary circumstances referred to in *Armco* exist in this case. Ross asserts that the § 7003 Order is confiscatory because it directs "the shutdown of units that had been operative for approximately 16 years," thus denying Ross "the use of a substantial income producing feed mechanism and ... participat[ion] in new market aerosol business opportunities." Ross also asserts the EPA has taken action to thwart judicial review by "foot dragging" and also by making the cost of violating the § 7003 Order so exorbitant that Ross cannot possibly choose to give the EPA reason to bring a legal enforcement action. Specifically, Ross states the EPA has threatened it with all of the following, if it violates the § 7003 Order: (1) fines of up to $5,000 per day; (2) a judicial enforcement proceeding; and (3) revocation of its RCRA waste disposal permit. Ross argues that the combined weight of these threats is so great a deterrent, the EPA has effectively forced it to comply with an order of "uncertain legality," thereby trampling its due process rights. Ross insists it should not have to choose between complying with the EPA's every demand, or violating the EPA's Order and possibly losing its RCRA permit to do business.

■ The Court is unpersuaded that the circumstances in this case rise to the level of a due process violation.[7] In *Wagner*

---

flaunt the § 7003 Order, create a dire environmental emergency, and force the EPA to bring an enforcement action, just so Ross can get judicial review. This argument fails not only for the reasons discussed *infra,* but also because "RCRA preclusion of pre-enforcement review does not turn on the seriousness of the risk posed by the site at issue." *Mobil Oil,* 1997 WL 1048911 at *5 (noting also that "courts interpreting other environmental statutes ... have concluded that EPA orders are

free from pre-enforcement review regardless of the urgency of the cleanup at issue").

7. The Court does, however, continue to stand by its view, as articulated in *Armco,* that there are limits to the EPA's ability to "hold hostage" putative violators through use of its administrative powers. The Court notes, moreover, that if the EPA continues to exercise the authority granted to it by Congress in the apparently insensitive manner it has done

*Seed Co. v. Daggett,* 800 F.2d 310 (2nd Cir.1986), the EPA issued an administrative compliance order to the plaintiff, pursuant to a provision contained in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9606(a). This § 9606 Order directed the plaintiff to clean up some toxic chemicals that had spilled at its facility during a fire caused by lightening. Like the § 7003 Order in this case, the § 9606 Order in *Wagner,* "provided for daily fines of $5,000 for noncompliance." *Id.* at 313. Further, the § 9606 Order threatened *treble* damages if the plaintiff refused to clean up the spill and forced the government do the clean up itself. Thus, the EPA's "administrative order directing [Wagner Seed] to clean up the toxic spill promptly placed [the company] on the horns of a dilemma. To comply would be costly without the possibility of reimbursement from another responsible party; to refuse to comply would subject it to heavy fines." *Id.* at 312.

Like Ross, the plaintiff in *Wagner* believed it had "a complete defense to the administrative order, [so] it commenced ... litigation." *Id.*[8] The *Wagner* plaintiff argued that "the amount that it would be required to spend to comply with the order represents a taking without due process;

and, ... the threat of fines and penalties ... so penalize appellant for attempting to seek judicial review as to violate *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)." *Id.* at 314.[9] The *Wagner* court disagreed, noting that: (1) the plaintiff could simply choose "not to comply" with the § 9606 Order, rely on its "complete defense" at any subsequent enforcement proceeding, and then avoid the cost of compliance altogether if the defense succeeded, *id.* at 317; and (2) if the defense failed and it did not succeed, even though the EPA could seek imposition of fines and penalties, "collection is only possible after a judicial hearing," and "there is no constitutional violation if the imposition of penalties is subject to judicial discretion" *id.* at 316. *See also Armco,* slip op. at 8 ("due process does not demand pre-enforcement judicial review whenever the potential for the imposition of fines exists. This is especially true where, as here, the [RCRA] statute is not self-executing on the issue of fines—it authorizes a court to impose fines in response to an EPA enforcement action") (citations omitted).

The logic of *Wagner* applies equally here. Ross can choose not to comply with the § 7003 Order, at which time the EPA will decide whether to seek judicial enforcement.[10] If the EPA employs the dis-

---

here, Congress may well choose either to restrict that authority or subject it to earlier judicial oversight. Congress has not, however, yet chosen to check the EPA's authority in that way.

**8.** The plaintiff in *Wagner* believed it had a complete defense in that the toxic spill was caused by an act of God, so it was not a "responsible party" and thus should not be required to pay for clean-up efforts. Ross believes it has a complete defense in this case because none of the aspects of its aerosol feeders identified by the EPA as needing correction do, in fact, need correction to comply with RCRA.

**9.** *Ex Parte Young* "established that mandatory penalties incurred because a party has chosen to seek judicial review are unconstitutional where 'the penalties for disobedience are by fines so enormous and imprisonment so se-

vere as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation....'" *Wagner,* 800 F.2d at 315 (quoting *Ex Parte Young,* 209 U.S. at 147, 28 S.Ct. 441).

**10.** Ross would not necessarily be exposing itself to substantial penalties if it begins operating its aerosol feeders despite the § 7003 Order. Ross could promise unequivocally to operate the feeders beginning on a date certain, possibly inducing the EPA to then bring an enforcement action to prevent this resumption of activity. 42 U.S.C. § 6973(b). If the EPA then refuses to bring an enforcement action in light of such a promise, and if the promise was actually carried out after Ross's deadline expired, then the EPA's inaction could constitute bad faith or give rise to a laches defense to the imposition of daily fines. While Ross apparently tried to employ this tactic in its July 29, 1999 letter ("if such

cretion given to it by Congress *not* to enforce the Order, Ross has no problem.[11] If the EPA instead employs its discretion and does seek judicial enforcement, Ross will obtain part of what it seeks—judicial review—at which time it can interpose any defenses (including constitutional defenses) against the § 7003 Order and/or the imposition of fines and penalties. This is all that due process requires. Alternatively, Ross can choose to *comply* with the § 7003 Order and negotiate with the EPA regarding the type and extent of modifications necessary to resume operation of the aerosol feeders. The existence of case law discussing " § 7003 Consent Orders" reveals that waste handlers often pursue this alternative. *E.g., Feikema v. Texaco, Inc.,* 16 F.3d 1408, 1414 (4th Cir.1994) (discussing the preemptive reach of a "Consent Order entered pursuant to section 7003"). Indeed, it is the availability of this last option—which could ultimately produce a settlement of the parties' dispute with no judicial intervention at all—that militates most strongly against Ross's position.

Finally, the Court notes that *Allsteel,* the only case cited by the parties where a court allowed pre-enforcement judicial review of an administrative order issued by the EPA, is easily distinguished on its facts. *Allsteel* presented "an unusual fact situation," 25 F.3d at 316, including the circumstances that: (1) the EPA's order required Allsteel to "close down indefinitely construction of a major [new manufacturing facility] which had not yet initiated any emissions," even though Allsteel had already received a construction permit from the "Division of Air Pollution Control

of the Tennessee Department of Environment and Conservation," *id.* at 315, 313; and (2) compliance with the order "probably would have jeopardized Allsteel's very survival," *id.* at 315. In this case, Ross's operation of the aerosol feeders *have* led both to emissions and to RCRA violations, and compliance with the § 7003 Order does *not* threaten Ross's continued viability. To the extent *Allsteel* suggests extreme facts may implicate due process concerns, which in turn support pre-enforcement judicial review of an administrative order issued by the EPA, the instant case is not comparable.

In sum, the Court concludes that this case is not legally distinguishable from *Armco,* where the Court held that "RCRA precludes judicial review of pre-enforcement agency orders issued under § 3013 of that Act." Slip op. at 2. RCRA precludes pre-enforcement judicial review of agency orders issued under § 7003 of RCRA, as well. Accordingly, the EPA's motion to dismiss for lack of jurisdiction is granted. Given that this Court does not have jurisdiction over the controversy presented, the parties' remaining motions must be denied as moot.

**IT IS SO ORDERED.**

approval [to recommence operations] is not forthcoming, within the next three weeks, Ross believes it is justified to begin operation of the system thereafter"), Ross backed away from this somewhat equivocal statement when the EPA asked for more time to respond.

11. Ross asserts that a choice by the EPA not to enforce the § 7003 Order is extremely unlikely on the facts of this case, and would represent a failure of the EPA to "liv[e] up to its congressional mandate." Given that the

EPA would never chose non-enforcement, then, Ross argues that the "EPA's contention that permitting pre-enforcement review of a § 7003 Order would deprive it of the option not to enforce the Order ... is virtually nonsensical." This assertion carries little weight because: (1) the "congressional mandate" includes giving the EPA a choice of how to assure statutory compliance and how to employ its limited resources; and (2) the availability of *pre*-enforcement judicial review does not depend on the likelihood that the EPA will later sue for enforcement in a given case.